1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ADVANCED THERMAL SCIENCES

CORPORATION, *a Delaware*

*Corporation*,

                         Plaintiff,

        v.

APPLIED MATERIALS, INC., *a*

*Delaware Corporation*,

                         Defendant,

AND RELATED COUNTERCLAIMS

CASE NO:

SACV 07-1384 JVS (JWJx)

FINDINGS OF FACT AND

CONCLUSIONS OF LAW

        The remaining claims of  Plaintiff/Counterdefendant Advanced Thermal

Sciences Corporation ("ATS") and Defendant/Counterclaimant Applied Materials,

1

Inc. ("AMI") were tried to the Court.  After substantial motions practice,[1] the following claims and defenses remained:

> • Each party's claim to ownership of U.S. Patent No. 7,415,835 ("the '835 Patent");

> • Each party's claim to ownership of ten patent applications filed by AMI;[2]

> • Each party's claim that the other breached the Joint Development Agreement ("JDA") and for damages resulting therefrom;

> • Each party's claim to ownership of physical chiller products designated as DX-01 and PX-7;

> • Various legal and equitable defenses to these claims.

(Pre-Trial Conference Order, pp. 6-7, Docket No. 671 ("PTCO").)  The Court took direct evidence by way of declarations,[3] and cross-examination and further examination was received live.  Following the submission of extensive proposed findings of fact and conclusions of law,[4] the Court entertained closing argument.

---

[1]Docket Nos. 313, 352, 548, 554, 549, 557, 558, 589.

[2]See ¶ 42 , infra.

[3]See Docket No. 668.

[4]ATS Proposed Findings of Fact and Conclusions of Law, Docket No. 848; AMI's Proposed Findings of Fact and Conclusions of Law, Docket Nos. 849, 853 (Corrected).   The parties also lodged evidentiary appendices, which greatly assisted the Court in tracking and analyzing the parties' factual contentions.  Docket Nos. 850, 851.

The Court now enters its Findings of Fact and Conclusions of Law.

SUMMARY

For the benefit of the reader, the Court summarizes its key factual and legal holdings.  First, AMI independently developed and reduced to practice in 2001-2002 the Transfer Direct technology reflected in Claims 3 and 4 of the '835 Patent. This occurred prior to the "TDSF" Statement of Work and ATS's dealing with AMI on the Transfer Direct technology.  As a result, the '835 Patent is the exclusive technology of ATS, and AMI has no interest.

Second, the JDA affords AMI an exclusive interest in the physical embodiments of any "improvement, enhancement, change, or modification" to Applied Equipment developed under the JDA. Ex. 1, p. 6, § 8.4.  However, this right does not extend to the intellectual property which may inhere in such physical improvements, enhancements, or changes; other specific provisions of the JDA dealing with intellectual property determine the parties' respective ownership rights.  Because ATS made a creative contribution to the ten AMI patent applications, the patent applications represent Jointly Developed IP, and AMI has a joint one-half interest in those applications.  AMI is ordered to take steps to restore ATS's rights in those applications.

Third, AMI breached its duty to consult with ATS before filing its ten patent applications.   ATS is entitled to damages under the reliance theory recognized by California law and the Restatement of Contracts, subject to certain reductions reflected in the Restatement.

JURISDICTION AND VENUE

ATS is a Delaware corporation having its principal place of business in Anaheim, California.  PTCO, p. 1.  AMI is a Delaware corporation having its principal place of business in Santa Clara, California.   Id.

The parties seek relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and this Court has subject matter jurisdiction under 28 USC §§ 1331 and 1338(a).  PTCO, p. 2.  ATS's declaratory relief claim regarding inventorship of issued United States patents is an action arising under 35 U.S.C. § 256, and therefore this Court has exclusive subject matter jurisdiction pursuant to at least 35 U.S.C. §§ 1331 and 1338(a).  In addition, the Court has supplemental jurisdiction over the parties' state law claims pursuant to 28 USC § 1367(a).  Id.  Neither party disputes personal jurisdiction or venue.  Id.

## FINDINGS OF FACT[5]

I.     Background.

1.     *Relationship Of The Parties*.   ATS is a manufacturer and provider of temperature control systems for use with semiconductor and flat panel fabrication equipment.  Ex. 1, p. 1 (Recital B).

2.     ATS was founded by B/E Aerospace ("B/E") in 1999.  ATS's

---

[5]Trial declarations are referred to by the name of the declarant (e.g., Trial Declaration of Kenneth Cowans is referred to as "K. Cowans").  Trial Exhibits are referred to as "Ex."  Transcript references are cited by witness, date, volume (if more than one), and page number (e.g., Thayer, Nov. 10, 2009, p. 37:14-22).

business plan was to develop refrigeration products for the semiconductor industry, specifically temperature control systems and subcomponents that are used inside chillers.  Thayer, ¶ 8.

3.     ATS has developed and manufactured temperature control systems for use with semiconductor equipment since 1996.  K. Cowans, ¶ 4; Thayer, ¶ 8.

4.     AMI is a manufacturer of semiconductor fabrication equipment.  Ex. 1, p. 1 (Recital A).  AMI is a global leader in nano-manufacturing technology equipment, services, and software.  Buchberger Resp., ¶ 14.  AMI has several business units, one of which is the Etch Product Business Unit.  Id., ¶ 1.

5.     AMI is the world's largest supplier of semiconductor equipment. Barsch, ¶ 6 (1:28-2:1).  AMI is currently the third largest supplier of etch semiconductor tools in the world.  Id., ¶ 12 (3:11-13).

6.     AMI, including its Etch group, is not in the business of developing temperature control systems.  Brillhart, ¶ 32; Hellman, Nov. 13, 2009, pp. 248:13-15.  Instead, AMI's Etch group focuses on improving AMI's etch tools, particularly the electrostatic chuck base.  Id.

7.     Semiconductor etching is a highly energy-intensive process in AMI equipment.  Id., ¶ 5.  Excessive heat can lead to defects and nonuniformities in a processed wafer.  Id.  Heat is controlled by using temperature control units ("TCU") that AMI typically purchases from vendors.  Id.  All TCUs, or "chillers," must be tested, qualified, and approved for use with a particular AMI etch tool or

other AMI process tool.  Barsch, ¶¶ 18-23.  A TCU cannot be simply "plugged in" to an AMI tool unless it has been specifically modified or "qualified" for use by AMI.  Id., ¶ 21.

8.    A relationship with AMI was important to ATS.  ATS wanted to work with AMI because, among other reasons, AMI was the world's largest producer of semiconductor manufacturing equipment, and ATS wanted to make subsystems for semiconductor manufacturing equipment.  Thayer, Nov. 10, 2009, pp. 37:14-22.

9.    ATS has been supplying temperature control systems to AMI since approximately 1997.  Thayer, ¶ 10.  These temperature control systems were designed by ATS and purchased by AMI to control the temperature of the AMI semiconductor tools, including electrostatic chucks.  Fovell, Nov. 11, 2009 (am), pp. 32:17-33:12.

10.   In the late 1990s, AMI viewed ATS as a creative chiller development company that provided unconventional solutions to conventional problems. Thayer, ¶ 12 (3:10-13).  Accordingly, AMI proposed that the parties enter into a joint development agreement.  Id., ¶ 12.

11.   *The Joint Development Agreement.*   Beginning in 1999, ATS and AMI began negotiating a JDA.  Hellmann, ¶ 5.  Both AMI and ATS wanted to enter into a JDA to allow, among other things, the parties to work together to address thermal control problems in the semiconductor equipment space.  Thayer, ¶ 12.  AMI and ATS executed the JDA, effective May 15, 2000.  Ex. 1, p. 1.

12.     The general purpose of the JDA was to establish a framework for further development projects between ATS and AMI using a Statement of Work, or "SOW," structure similar to that used by ATS/B/E and AMI for the development of the C1.0 conventional chiller and its progeny.  The JDA included an SOW template and Schedule templates covering a range of different development projects from minor development to major development projects. The term of the JDA was from May 2000 to May 2005.  Each project would be governed by a SOW.  Ex. 1, p. 1 (Recital C).

13. AMI and ATS negotiated the JDA for more than a year. Hellmann, ¶ 7; Thayer, Nov. 10, 2009, pp. 36:24-37:4.  Bruce Thayer ("Thayer") was the principal negotiator for ATS and Tim Hellmann ("Hellmann") was the principal negotiator for AMI.  Both sides were sophisticated companies represented by legal counsel during the negotiations.  Thayer, ¶ 13; Hellmann, ¶ 5.  ATS and AMI engaged in a sentence-by-sentence negotiation of the JDA.  Hellmann, ¶ 5.

14.     The purposes of the projects were to: "(i) test and possibly qualify certain of [ATS's] Components as Fit For Use on certain of [AMI's] systems and/or processes; and/or (ii) develop solutions for applications."  Id., p. 1 (Recital C).

15.     The JDA provided for four classes of projects.  Id., p. 1 (Recital D). Schedules to the JDA set forth the parties' respective rights, expectations, and commitments for each class of project.  Id.

16.     The JDA also defines various types of intellectual property ("IP").

7

Id., pp. 3-4, § 1.0 (Definitions).

17.   "Pre-Existing IP" is defined as "[e]ach Party's Intellectual Property rights in existence as of the execution date of the applicable SOW."  Id., p. 4, § 1.0 (Definitions).  Each party's Pre-Existing IP remains such Party's sole property. Id., p. 5, § 4.1.

18.   "Developed IP" is defined as "[a]ny and all improvements, enhancements or modifications made to a Component or [AMI] Equipment, . . . and all Intellectual Property rights embodied in any of the foregoing, that are created, conceived or first reduced to practice during the course of this Agreement."   Id., p. 4, § 1.0 (Definitions).

19.   ATS Developed IP and AMI Developed IP are defined as Developed IP that is created, conceived, or first reduced to practice by ATS or AMI without creative or inventive contribution from the other party.  Id.  ATS solely owns all ATS Developed IP, and AMI solely owns all AMI Developed IP.  Id., p. 6, §§ 4.3-4.4.

20.   Jointly Developed IP is defined as "[a]ll Developed IP created, conceived, or first reduced to practice jointly by [ATS] and [AMI] or employees of each during the course of and directly as a result of the performance of the Project . . . , and wherein each Party has made an inventive or creative contribution thereto through the combined efforts of employees of each Party collaborating together." Id., p. 4, § 1.0 (Definitions).  The parties jointly own Jointly Developed IP and each party has an equal and undivided one-half interest in Jointly Developed IP.

Id., p. 6, § 4.5.

21.    Although ownership of Pre-Existing IP, ATS Developed IP, AMI Developed IP, and Jointly Developed IP is set forth in Sections 4.1, 4.3, 4.4, and 4.5 of the JDA as described above, the parties have additional rights and obligations concerning Developed IP.  Id., p. 5., §4.2.  Specifically, the parties' rights and obligations with respect to the filing and prosecution of patent applications on ATS Developed IP, AMI Developed IP, and/or Jointly Developed IP, are set forth in the Schedules to the JDA.  Id.

22.    The JDA expired on May 14, 2005.  Ex. 1; PTCO, Admitted Facts ["AF"], ¶ 23.

23.    The TDSF SOW.  On May 4, 2004, the parties entered into the ATSC "TDSF" Statement of Work ("TDSF SOW").   Ex. 3; AF, ¶24.

24.    The Transfer Direct Saturated Fluid ("TDSF") technology is an improvement over conventional temperature control systems.  While conventional systems use two distinct loops of circulating fluid: (1) a refrigeration loop, which used a pressurizable refrigerant; and (2) a loop of intermediate liquid thermal transfer fluid, the TDSF system eliminates the second loop and transfers the refrigerant directly to the thermal load.  K. Cowans, ¶ 6; Jacobi, ¶ 19.

25.    The TDSF SOW was intended to drive the development, design, testing, and qualification of the TDSF chiller in accordance with the specification for AMI's Etch group and ATS's patented technology for TDSF.  Ex. 3, p. 2, § 2.0.

9

26.     The TDSF SOW was classified as a "Class 3 – Major Development" project, and therefore certain rights of the parties were set forth in Schedule 3 to the JDA.  Ex. 3, p. 1; Ex 1, pp, 17-18, Sched. 3.

27.     The TDSF SOW was a major development project for the development of a non-conventional chiller product – later termed the "DX-01"–for use on AMI's Etch system.  Ex. 3, p. 1.  The parties agree that the physical DX-01 chiller units are jointly owned as the product of joint development between ATS and AMI.  ATS Opening Stmt., Nov. 10, 2009, p. 10:1-6.

28.     Particularly relevant to the dispute before the Court is Section 2 of Schedule 3, which sets forth the parties' rights and obligations with respect to the filing and prosecution of patent applications for Jointly Developed IP in Class 3 projects such as the TDSF SOW.  Ex. 1, p. 5, § 4.2.  Section 2 of Schedule 3 provides that "[t]he Parties will consult with each other regarding whether an application or applications for patent . . . should be filed, prosecuted, or maintained for any Jointly Developed IP."  Id., p. 17, Sched. 3, § 2.0.

29.     The TDSF SOW expired on May 14, 2005.  Ex. 3; AF, ¶ 24.

30.     *The Parties' Dispute*.   The parties dispute ownership of tangible physical chiller units and intangible intellectual property rights.  The physical chiller units at issue bear the designations "DX-01" and "PX-7."  The intellectual property rights at issue are defined by the claims of the parties' respective patents and patent applications.

31.    As the Court previously held, the claims of the patents and patent applications control the determination of who owns the intellectual property rights. Docket No. 558, p. 8.  Alleged contributions are irrelevant unless they are claimed in the patent filings.  Id.  Subject matter disclosed, but not claimed, in the patents filings is irrelevant to the ownership determination.  Id.

32.    *The ATS Patent Filings*.   On February 19, 2004, ATS filed a provisional patent application relating to the TDSF technology.  AF, ¶ 1; Ex. 67. That application, which was assigned U.S. Provisional Patent Application No. 60/546,059 ("the '059 provisional application"), was entitled "Transfer Direct of Saturated Fluid System," and named Kenneth W. Cowans, William W. Cowans, and Glenn Zubillaga as inventors.  AF, ¶ 1.

33.    On June 2, 2004, ATS filed a second provisional patent application relating to the TDSF technology.  AF, ¶ 2; Ex. 68.  That application, which was assigned U.S. Provisional Patent Application No. 60/576,705 ("the '705 provisional application"), was entitled "Transfer Direct Heat Exchanger System," and also named Kenneth W. Cowans, William W. Cowans, and Glenn W. Zubillaga as inventors.  AF, ¶ 2.

34.    On February 15, 2005, ATS filed a non-provisional application relating to the technology at issue.  Ex. 180.  That application, U.S. Patent Application No. 11/057,383 ("the '383 application"), issued as U.S. Patent No. 7,178,353 ("the '353 Patent").  The '353 Patent was duly issued by the United States Patent & Trademark Office on February 20, 2007.  AF, ¶ 3; Ex. 4..

35.     The '835 Patent was duly issued by the United States Patent & Trademark Office on August 26, 2008.  Ex. 87.  The '835 Patent issued from a divisional application of the '383 application, filed on February 15, 2005.  AF, ¶ 4; Ex. 180.

36.     The '353 Patent and the '835 Patent are both entitled "Thermal Control System and Method," and both name Kenneth W. Cowans, William W. Cowans, Glenn W. Zubillaga, and Isaac Millan as inventors.  AF, ¶ 5.

37.     The '353 Patent and the '835 Patent both claim priority to the '059 provisional application and the '705 provisional application.  AF, ¶ 6.

38.     U.S. Patent Application No. 11/591,465 ("the '465 Application") was filed on November 2, 2006.  The '465 application claims priority to U.S. Provisional Application No. 60/733,078, which was filed on November 3, 2005. AF, ¶ 7.

39.     The '835 Patent and the '353 Patent share the same specification.  AF, ¶ 8.

40.     *The AMI Patent Applications.*   On October 11, 2005, AMI filed U.S. Provisional Patent Application No. 60/725,763 ("the '763 provisional application"), entitled "Capacitively coupled plasma reactor having a cooled/heated wafer support with uniform temperature distribution," naming Daniel J. Hoffman, Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli, Douglas A. Buchberger Jr., Douglas H. Burns, and Kallol Bera as inventors.  AF, ¶

9.

41.    On October 20, 2005, AMI filed U.S. Provisional Patent Application No. 60/729,314 ("the '314 provisional application"), entitled "Method for agile workpiece temperature control in a plasma reactor using a thermal model," naming Daniel J. Hoffman, Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli, Douglas A. Buchberger Jr., Douglas H. Burns, and Kallol Bera as inventors.  AF, ¶ 10.

42.    On April 21 and 24, 2006, AMI filed ten non-provisional patent applications that claim priority to either the '763 provisional application or the '314 provisional application.  These are the applications in which ATS claims an interest:

(1)  U.S. Pat. Application No. 11/408,559 ("the '559 application"), entitled "Plasma Reactor with a Multiple Zone Thermal Control Feed Forward Control Apparatus," was filed on April 21, 2006, and named Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli, Douglas A. Buchberger Jr., Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '559 application claims priority to the '314 provisional application.  AF, ¶ 11.

(2)  U.S. Pat. Application No. 11/408,558 ("the '558 application"), entitled "Method for Agile Workpiece Temperature Control in a Plasma Reactor Using a Thermal Model," was filed on April 21, 2006, and named Douglas A. Buchberger, Jr., Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli,

13

Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '558 application claims priority to the '314 provisional application.  AF, ¶ 12.

.

(3)  U.S. Pat. Application No. 11/408,567, entitled "Plasma Reactor with Wafer Backside Thermal Loop, Two-Phase Internal Pedestal Thermal Loop and a Control Processor Governing Both Loops" ("the '567 application"), was filed April 21, 2006, and named Douglas A. Buchberger, Jr., Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli, Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '567 application claims priority to the '314 provisional application.  AF, ¶ 13.

(4)  U.S. Pat. Application No. 11/409,183 ("the '183 application"), entitled "Plasma Reactor with Feed Forward Thermal Control System Using a Thermal Model for Accommodating RF Power Changes or Wafer Temperature Changes," was filed April 21, 2006, and named Douglas A. Buchberger, Jr., Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli, Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '183 application claims priority to the '314 provisional application.  AF, ¶ 14.

(5)  U.S. Pat. Application No. 11/409,184, entitled "Method of Processing a Workpiece in a Plasma Reactor Using Multiple Zone Feed Forward Thermal Control" ("the '184 application"), was filed April 21, 2006, and named Paul Lukas Brillhart, Richard Fovell, Douglas A. Buchberger Jr., Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '184

14

application claims priority to the '314 provisional application.  AF, ¶ 15.

(6)  U.S. Pat. Application No. 11/409,326, entitled "Method of Processing a Workpiece in a Plasma Reactor Using Feed Forward Thermal Control" ("the '326 application"), was filed April 21, 2006, and named Douglas A. Buchberger, Jr., Paul Lukas Brillhart, Richard Fovell, Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '326 application claims priority to the '314 provisional application.  AF, ¶ 16.

(7)  U.S. Pat. Application No. 11/409,292 ("the '292 application"), entitled "Capacitively Coupled Plasma Reactor Having a Cooled/Heated Wafer Support With Uniform Temperature Distribution," was filed April 21, 2006, and named Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli, Douglas A. Buchberger Jr., Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '292 application claims priority to the '763 provisional application.  AF, ¶ 17.

(8)  U.S. Pat. Application No. 11/408,333 ("the '333 application"), entitled "Capacitively Coupled Plasma Reactor Having Very Agile Wafer Temperature Control," was filed April 21, 2006, and named Douglas A. Buchberger, Jr., Paul Lukas Brillhart, Richard Fovell, Hamid Tavassoli, Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '333 application claims priority to the '763 provisional application.  AF, ¶ 18.

(9)  U.S. Pat. Application No. 11/410,782 ("the '782 application"), entitled

"Method of Cooling a Wafer Support at a Uniform Temperature in a Capacitively Coupled Plasma Reactor," was filed April 24, 2006, and named Paul Lukas Brillhart, Richard Fovell, Douglas A. Buchberger Jr., Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '782 application claims priority to the '763 provisional application.  AF, ¶ 19.

(10)  U.S. Pat. Application No. 11/410,859 ("the '859 application"), entitled "Method of Operating a Capacitively Coupled Plasma Reactor With Dual Temperature Control Loops," was filed April 24, 2006, and named Paul Lukas Brillhart, Richard Fovell, Douglas A. Buchberger Jr., Douglas H. Burns, Kallol Bera, and Daniel J. Hoffman as inventors.  The '859 application claims priority to the '763 provisional application.  AF, ¶ 20.

These are the AMI patent applications in dispute.

43.     *Summary Of The Parties' Allegations*.   In September 2007, ATS learned that AMI had filed the above-mentioned patent applications, but only <u>after</u> they had been published.  K. Cowans, ¶ 76.

44.     ATS raised with AMI the fact that none of the applications named any ATS employee as an inventor.  Thayer, ¶ 24.  When AMI declined to recognize any interest by ATS in any of the ten patent applications, and also claimed an interest in ATS's patent filings, ATS filed this action on November 29, 2007.  Docket No. 1.  At that time, ATS stopped working with AMI on the TDSF project.  Thayer, ¶ 24.

45.     ATS alleges that it is the sole owner of its patent filings.  ATS also alleges that at least one claim in each of the ten patent applications filed by AMI claims ATS's Pre-Existing IP or Jointly Developed IP, and that, as a result, ATS has an equal and undivided one-half interest in each of the ten AMI patent applications.  PTCO, pp. 7-8.  ATS further alleges that AMI breached the JDA by filing and prosecuting the ten patent applications without consulting with ATS.  Id. ATS seeks damages for AMI's breach of the JDA.  Id., pp. 8, 22.

46.     AMI counterclaimed alleging that at least one claim in each of the ATS patent filings claims Jointly Developed IP, and that, as a result, AMI has an equal and undivided one-half interest in each of the ATS patent filings.  Id., p. 15. AMI further alleges that ATS breached the JDA by filing and prosecuting the ATS patent filings without consulting with AMI.  Id., p. 14.  The parties' patent filings are the only intellectual property rights at issue in this case.

47.     AMI also alleges that particular chiller units embodying the TDSF technology, referred to as DX-01 and PX-7 chillers, are Jointly Developed IP and, thus, AMI has an undivided one-half interest in those chillers.  Id., p. 13.

II.     The Ownership of the '835 Patent.

48.     This Court granted ATS's motion for summary judgment regarding inventorship of ATS's '353 and '835 Patents.  Docket No. 352, p. 20; Docket No. 554, p. 11.

49.     This Court granted ATS's motion for summary judgment that ATS is

the sole owner of Claims 1, 2, and 5-8 of ATS's '835 Patent.  Docket No. 678, p. 2.

50.    The only issue with respect to the ATS patent filings that remained for trial was ownership of the '835 Patent and, specifically, whether AMI made an "inventive or creative contribution" to the inventions of Claims 3 or 4 of the '835 Patent.  Docket No. 558, p. 10 n. 4; Docket No. 678, p. 2.

A.    <u>AMI Did Not Contribute To Maintaining Two-Phase Flow Throughout The Thermal Load</u>.

51.    Claim 3 of the '835 Patent depends from Claim 2, and adds, "the step of exchanging heat between said thermal load and said mixture in such manner that both liquid and gas are present at the exit of said thermal load."[6]  Ex. 87, col. 13, ll. 16-19.

52.    Claim 4 of the '835 Patent depends from Claim 2 and adds, "the step of exchanging heat between said thermal load and said mixture of liquid and gas such that said mixture exists completely within the range of pressure and enthalpy within the vapor dome of said refrigerant."  <u>Id.</u>, col. 13, ll. 20-24.

53.    *ATS's Creation and Conception.*  In or about August 2000, Ken

---

[6]As discussed in greater detail in the Conclusions of Law, Claim 3 does not require maintaining a two-phase flow throughout the thermal load because it applies to both heating and cooling the thermal load.  France, Nov. 20, 2009 (pm), pp. 8:22-9:5.

Cowans of ATS conceived of eliminating the intermediate thermal transfer fluid loop from ATS's conventional chillers and passing the refrigerant directly through the semiconductor tool.  K. Cowans, ¶ 17.

54.    ATS referred to this concept by various names, including "direct expansion," "direct cooling," "transfer direct," "TD," "transfer direct saturated fluid," and "TDSF."  K. Cowans, ¶ 20; W. Cowans, ¶ 2.

55.    Ken Cowans' conception of a single-loop temperature control system in 2000 or 2001 is corroborated by the testimony of numerous ATS employees. W. Cowans, ¶¶ 2-3; Millan, ¶ 6; Christoffersen, ¶ 6; Thayer, ¶ 20; Goyins, ¶¶ 5-6.

56.    Ken Cowans' conception of a single-loop temperature control system is well documented in his lab notebooks, including by the many references to the various names of the TDSF system and the many schematic diagrams of the TDSF system.  See, e.g., K. Cowans, ¶¶ 25-32; Ex. 150, pp. 26, 61, 90, 98, 101; Ex. 151, p. 27; Ex. 153, p. 16.

57.    ATS's refrigeration expert, Dr. Anthony Jacobi, confirmed that the lab notebook entries of several ATS employees, including Ken Cowans, contained schematic diagrams that a person familiar with refrigeration technology would understand as depicting a single-loop temperature control system that used the tool as an evaporator.  Jacobi, ¶ 25.

58.    The schematic diagrams in the ATS lab notebooks replace the typical evaporator in a refrigeration loop with a "tool," and a person familiar with

refrigeration technology would understand that, when cooling, the system would use the tool as the evaporator. Id.   In addition, because the output of the thermoexpansion valve is always in the form of a two-phase mist, and the two-phase mixture absorbs heat from the thermal load, a person skilled in art would understand that, as shown in the schematic diagrams in the ATS lab notebooks, the tool necessarily acts as an evaporator.  K. Cowans, Nov. 10, 2009, pp. 186:23-187:12.

59.    In addition, the schematic diagrams for the TDSF system contained in ATS lab notebooks from 2000 and 2001 are substantively identical to the schematic diagrams used by AMI as recently as 2007 to describe the TDSF technology, which AMI referred to as the direct expansion technology. *Compare* Ex. 150, pp.  61, 90, 98 *with* Ex 197, p. 10; Jacobi Rebuttal, ¶ 101, pp. 12:17-13:15 (stating that the schematic diagrams of the TDSF and direct expansion system in presentations dated 2004-2007 are "virtually identical to the schematic diagrams contained in lab notebooks of ATS employees dated 2000 and 2001").

60.    AMI's use of such schematic diagrams to convey the TDSF concept (i.e., eliminating the secondary process loop and using the tool as an evaporator) to those in the industry, both internally at AMI (see Ex. 5, p. 2), and externally to AMI's customers (see Ex. 197, p. 10), further confirms that one of skill in the art would understand that the schematic diagrams in ATS's 2000 and 2001 lab notebooks depict the same concept.

61.    As conceived by ATS in 2000 and 2001, the TDSF system was designed to control the temperature of semiconductor tools, and specifically

electrostatic chucks.  Ex. 1202, p. 103; W. Cowans, ¶¶ 18-19; W. Cowans, Nov. 10, 2009, pp. 213:13-214:6.

62.     AMI's expert Dr. Doug France ("Dr. France") agreed that the 2001 drawing of the TD150 system in William Cowans' lab notebook showed the refrigerant flowing directly into and out of the electrostatic chuck base in the same manner as Dr. France illustrated during his deposition when asked to draw the technology at issue.  France, Nov. 20, 2009 (am), p. 38:16-25; *compare* Ex. 1202, p. 103 *with* Ex. 399, Figure A.  Here and elsewhere, the Court has given substantial weight to the concessions Dr. France made on cross-examination.

63.     *Contemporaneous Documents.*  Ken Cowans testified that, "in the cooling mode, the TDSF was designed to have a vapor-liquid mixture in the supply line, throughout the entire semi tool, and in the return line."  K. Cowans, ¶ 36.

64.     Ken Cowans' testimony that he conceived of maintaining a two-phase refrigerant throughout the thermal load is supported by the invention disclosure documents he submitted to ATS's patent attorney in December 2000 and January 2001.  K. Cowans, ¶¶ 33, 36; Ex. 163; Ex. 164.

65.     Ken Cowans' January 2001 invention disclosure expressly states that, "the semi tool and the lines connecting the TDSF with the semi tool function as an evaporator."  Ex. 163, p. 1.

66.     Both parties' experts agree that Ken Cowans' 2001 invention disclosure describes a system in which the refrigerant is maintained as a liquid-

vapor mixture throughout the semi tool.  Jacobi, ¶ 32; France Resp., ¶ 93 (conceding that Ex. 163 describes two-phase flow both in and out of the semi tool); see also France, Nov. 19, 2009 (am/pm), p. 83:11-15; France, Nov. 20, 2009 (pm), pp. 26:25-27:6.

67.    Ken Cowans' testimony that he conceived of maintaining a two-phase refrigerant throughout the thermal load is also supported by Ken Cowans' lab notebook entries.  For example, an entry in Ken Cowans' lab notebook dated February 3, 2001 contains a reference to the "quality" of the refrigerant in the return line.  K. Cowans, ¶ 40; Ex. 151, pp. 28-29.  As Ken Cowans explained, this reference to quality indicates that a two-phase mixture existed in the return line, and, therefore, at the outlet of the thermal load.  K. Cowans, ¶ 40.

68.  Ken Cowans and Dr. Jacobi also testified regarding an entry in Ken Cowans' lab notebook from February 3, 2001, in which Ken Cowans was considering the possibility of adding an accumulator after the outlet of the semi tool to collect liquid and prevent "puddling" in the return line.  The presence of liquid in the return line indicates that the refrigerant was maintained as a two-phase mixture throughout the thermal load.  K. Cowans, ¶¶ 41-42; Ex. 151, p. 29; Jacobi, ¶¶ 33-34.  Although Dr. France was aware of the notebook entry, he did not offer any opinion disputing Ken Cowans' description of the entry as specifically describing two-phase refrigerant flow exiting the tool.  France, Nov. 20, 2009 (pm) pp. 34:23-35:7.

69.    Dr. France offered no opinions disputing that ATS conceived of using the TDSF technology to heat the thermal load with two-phase flow exiting the

thermal load well before talking with anyone at AMI.  Id., p. 11:4-14.

70.    Ken Cowans' conception of the TDSF technology, and specifically the idea of maintaining a two-phase refrigerant throughout the thermal load, is further supported by the fact that he was aware of the importance of temperature uniformity when processing semiconductor wafers (K. Cowans, ¶ 11) was aware of the potential benefits of maintaining a two-phase mixture throughout the semi tool to improve temperature uniformity (id., ¶¶ 21-22), and is considered to be an expert in refrigeration technology even by AMI's expert (France, Nov. 20, 2009 (am), p. 9:23-25).

71.    Thus, there is no factual dispute that ATS conceived of the use of a two-phase refrigerant throughout the thermal load by early 2001, and the Court so finds.

B.    ATS First Reduced To Practice Two-Phase Flow Throughout The Thermal Load In 2001.

72.    There is no dispute that ATS constructed and tested a prototype of its TDSF system in 2001.

73.    Contemporaneous lab notebook entries reflect the construction of the 2001 TDSF prototype.  W. Cowans, ¶¶ 6-22; Ex. 1202, pp. 71, 89, 91, 93, 94, 96, 99, 101-103, 107, 109, and 110.

74.    ATS also has numerous computer-generated design drawings of the

2001 prototype dated December 2000 and January 2001.  See, e.g., Ex. 1118; Ex. 1123; Millan, ¶¶ 4-5 (listing drawings).  Later documents also confirm that the prototype was built and tested in approximately 2001.  See, e.g., Ex. 313 (e-mail from Bryan Christoffersen to Rick Fovell stating that ATS's "proof of concept" was "developed and built over two years ago").

75.    *2001 Prototype.*  Ken Cowans testified that a goal for ATS's 2001 TDSF prototype (Ex. 1077A), was to maintain a two-phase refrigerant throughout the thermal load, and that this goal was achieved.  K. Cowans, ¶ 44.

76.    William Cowans testified that, when the 2001 prototype was tested and was cooling the heat load, "the refrigerant existed as a two-phase mixture in the supply line to the heat load, throughout the thermal load, and in the return line."  W. Cowans, ¶ 5.

77.    ATS tested its 2001 TDSF prototype using a spa heater or an aluminum block as the thermal load to simulate ATS's customers' chucks.  Id., ¶ 4.

78.    Both Ken Cowans and William Cowans testified that, during testing of the 2001 Prototype, ATS encountered problems with "puddling" of liquid refrigerant in the return lines, which demonstrated that a two-phase refrigerant was being maintained throughout the load.  K. Cowans, ¶ 44; W. Cowans, ¶ 5.

79.    AMI's technical expert, Dr. France, agreed that liquid refrigerant accumulating in the return line meant that there was liquid refrigerant coming out of the thermal load.  France, Nov. 20, 2009 (pm), p. 32:8-11.

80.     Dr. France does not dispute Ken Cowans' and William Cowans' testimony regarding the testing of the 2001 Prototype.  France, Nov. 19, 2009 (am/pm), pp. 92:25-93:20, 94:16-23; France, Nov. 20, 2009 (pm), pp. 5:19-24, 7:15-18.

81.     Dr. France agreed that once ATS first reduced the two-phase flow to practice, there was no further creation or conception that would need to occur for that particular idea.  France, Nov. 20, 2009 (pm), p. 5:2-5.

82.     Dr. France further agreed that performing the method of Claim 4 (flowing two-phase refrigerant through the entirety of the thermal load) for any period of time would meet the limitations of Claim 4.   Id., p. 12:5-9.

83.     Dr. Paul Brillhart's ("Dr. Brillhart") later reference in March 2004, to the 2001 Prototype as a "proof of concept" of the direct expansion idea further confirms that ATS's 2001 prototype was capable of operating with a two-phase refrigerant throughout the thermal load.  Brillhart, Nov. 18, 2009 (am), p. 83:6-24.

84.     AMI does not argue that it made any contribution to the TDSF technology, including the 2001 Prototype, before the 2001 Prototype was tested in the spring of 2001.  Dr. Brillhart did not have his moment of conception, or "ah-ha moment," until 2003.

85.     Accordingly, the Court finds that ATS created, conceived of, and first reduced to practice the idea of maintaining a two-phase refrigerant throughout the thermal load by the Spring of 2001.

86.   ATS's creation, conception, and first reduction to practice of maintaining a two-phase refrigerant throughout the thermal load by 2001 renders any later activities by ATS or AMI irrelevant to ATS's ownership of Claims 3 and 4 of the '835 Patent.   However, additional activities by ATS that occurred prior to AMI's first allegedly documented reference to two-phase flow further confirm ATS's ownership.

87.   *2004 Constructive Reduction.*  ATS filed a provisional patent application on its TDSF system on February 19, 2004.  Ex. 67.

88.   ATS's provisional patent application discloses that, under certain operating conditions, the refrigerant will exist as a liquid-vapor mixture in the line to the tool, throughout the tool, and in the line returning from the tool.  Id., p. 6. The provisional application states that, after exiting the semi-tool, "[t]he gas or mix is then returned to the system in a closed loop.  At [t]he system any liquid is evaporated from the mix with use of an electric heater."  Id.

89.   As the Court previously held, "this clearly contemplates that the refrigerant could be a two-phase mix at both the inlet and outlet of the thermal load."  Docket No. 554, p.  9.

90.   As discussed above, returning a mixture of gas and liquid refrigerant from the thermal load means that there is a mixture of gas and liquid refrigerant throughout the thermal load.  France, Nov. 20, 2009 (pm), p. 32:8-11.

91.   ATS's February 19, 2004 provisional application therefore describes

the use of a two-phase refrigerant throughout the thermal load.   Jacobi Rebuttal, ¶ 82.

92.    AMI has not identified any documentary evidence suggesting that AMI employees contributed to the idea of maintaining a two-phase refrigerant throughout the thermal load prior to February 19, 2004.

93.    Dr. France conceded that he is not aware of any documents that, by themselves and without explanatory oral testimony from Dr. Brillhart or Fovell, indicate that AMI came up with any aspect of the two-phase technology before May 2004.  France, Nov. 20, 2009 (am), pp. 34:22-35:1; France, Nov. 19, 2009 (am/pm), p. 104:6-20.

94.    Accordingly, even if the Court were to find that ATS did not actually reduce to practice maintaining a two-phase refrigerant throughout the thermal load during testing of the 2001 Prototype, ATS constructively reduced to practice two-phase flow throughout the thermal load on February 19, 2004, and AMI did not contribute to ATS's constructive reduction to practice.  This provides an additional independent basis for finding that AMI did not contribute to Claims 3 or 4 of the '835 Patent.

C.    In 2004, AMI Agreed the TDSF Technology was ATS's Pre-Existing IP.

95.    ATS's sole ownership of the TDSF technology, including the concept of maintaining a two-phase refrigerant throughout the thermal load, is further

supported by AMI's recognition in early 2004 that the TDSF technology belonged to ATS.

96.  On January 30, 2004, Christoffersen sent Dr. Brillhart an e-mail attaching a non-disclosure agreement and stating that, "[a]ll I would like to add is a clear definition of our preexisting IP related to the transfer direct system[.]"  Ex. 75, p. 1. This was Christoffersen's attempt to have AMI acknowledge that the TDSF technology was ATS's Pre-Existing IP.  Christoffersen, ¶¶ 16-17.

97.  Neither Dr. Brillhart nor anyone at AMI ever expressed any disagreement with Christoffersen's statements that the Transfer Direct System was ATS's Pre-Existing IP.  Christoffersen, ¶ 18.

98.  Two weeks after Christoffersen's e-mail, Dr. Brillhart and Christoffersen executed a document, entitled "Addendum for AMI Materials Non Disclosure Agreement Rev. 1.0 08/00," in which AMI and ATS agreed that ATS possessed pre-existing intellectual property in:

Information relating to the concept termed by ATSC "Transfer Direct System" for temperature control.  This technology involves the use of vapor compression refrigeration techniques along with unique control, transport and thermal management techniques to achieve rapid temperature response, accurate temperature control and unique packaging.

Ex. 70, p. 1.  This is clear evidence that ATS informed AMI that TDSF was ATS's Pre-Existing IP.  Although he later asked to have the document returned to him, Dr.

Brillhart's signing of the NDA addendum confirmed that the Transfer Direct System was ATS's Pre-Existing IP.

99.    There is no dispute that "vapor compression," as used by the parties during this time frame, referred to the "TDSF" or "direct expansion" technology as reflected in the DX project.  Brillhart, Nov. 18, 2009 (am), p. 25:10-24; Buchberger, Nov. 12, 2009, p. 126:1-7 (AMI employees used the phrases "vapor compression" and "direct expansion" interchangeably to refer to the TDSF system).

100.    Dr. Brillhart understood that the reference to the Transfer Direct System in Exhibit 70 related to the earlier ATS presentation (Ex. 1128) of a single-loop system that delivered a two-phase mixture to the evaporator in the semi tool. Christoffersen, Nov. 12, 2009, pp. 29:16-31:1, 31:7-33:5, 49:14-18, 49:21-52:11.

101.    Dr. Brillhart never told anyone at ATS, at any time, that he was concerned that ATS might be claiming as pre-existing IP something that he had invented.  Brillhart, Nov. 18, 2009 (am), p. 36:20-25.

102.    *The TDSF SOW*.   On March 16, 2004, Christoffersen sent an e-mail to Dr. Brillhart proposing the initial terms for the TDSF SOW.  Ex. 55, p. 2; Christoffersen, ¶ 20.

103.    The e-mail refers to the technology as ATS's "patented technology." Ex. 55.  By that time, everyone involved, including Dr. Brillhart, knew that "TDSF" meant "direct expansion."  Brillhart, Nov. 18, 2009 (am), pp. 18:14-22, 72:10-73:1 (agreeing that by February 20, 2004, the terms "TDSF," "direct expansion," and

"DX" were all synonyms).  The fact that Christoffersen was incorrect, because ATS had not yet filed, but rather was shortly to file a patent for the technology, does not undermine the fact that the parties clearly understood that TDSF was ATS's Pre-Existing IP.

104.    Dr. Brillhart never disputed that the TDSF technology belonged to ATS or questioned why ATS had patented the TDSF technology.  Christoffersen, ¶ 22.

105.    The TDSF SOW repeatedly provides that the TDSF technology belongs to ATS and constitutes ATS's Pre-Existing IP.  For example, Section 2.0 refers to the technology as "Supplier's [ATS's] patented technology for TDSF."  Ex. 3, p. 2, § 2.0.  Section 7.4 refers to "Supplier's [ATS's] TDSF technology."  Id., p. 3, § 7.4. Section 11.3 refers to "Supplier's [ATS's] patented TDSF technology."  Id., p. 4, § 11.3.

106.    Section 10.1, which defines ATS's Pre-Existing IP, specifically includes "techniques for saturated fluid transfer temperature control," which referred to ATS's TDSF technology.  Id., p. 3, § 10.1; Christoffersen, ¶ 26.

107.    AMI's Dr. Brillhart, contract specialist Joe David, and attorney Rachel Puno were all involved in the negotiations with Christoffersen that resulted in the TDSF SOW, and no one from AMI ever disputed that the TDSF technology was ATS's technology.  Christoffersen, Nov. 12, 2009, pp. 55:8-58:4; Ex. 55.

108.    Christoffersen also had discussions with Dr. Brillhart where it was understood that the TDSF technology was ATS's technology.  Id., pp. 19:20-24,

59:21-60:7.

109.   For example, Christoffersen and Dr. Brillhart discussed IP ownership during negotiations relating to the TDSF SOW and they agreed that the TDSF technology belonged to ATS, and any technology AMI had in its particular chucks belonged to AMI.  Christoffersen, ¶ 3; see also Ex. 24 (Brillhart e-mail stating that AMI should redesign the chuck base around the performance of the new TDSF.)

110.   Thayer similarly testified that the TDSF SOW negotiations involved detailed discussions about ATS's TDSF technology and the use of ATS's TDSF technology, and Thayer did not recall anyone at AMI ever questioning that the TDSF technology was ATS's technology.  Thayer, ¶ 18.

111.   Dr. Brillhart never suggested to Roger Goyins ("Goyins") that any aspect of TDSF, Transfer Direct, or direct expansion technology had been Dr. Brillhart's idea.  Goyins Rebuttal, ¶ 43.

112.   Accordingly, the Court finds that the TDSF technology, as it existed on May 4, 2004 when the TDSF SOW was executed, was ATS's Pre-Existing IP.

113.   *Absence of AMI Creative or Inventive Contribution.*  AMI failed to establish that it made any inventive or creative contribution to the inventions of Claims 3 or 4 of the '835 Patent in 2003 or 2004.  The evidence establishes by a preponderance that AMI did not.

114.   Dr. Brillhart contends that in mid-2003 he conceived of the idea of

maintaining a two-phase refrigerant throughout the thermal load.  Brillhart, ¶ 17.

115.    As described above, and as AMI's own technical expert concedes, ATS created and conceived of the idea of maintaining a two-phase refrigerant throughout the thermal load at least as of January 2001, when Ken Cowans submitted his invention disclosure to his attorney.  Ex. 163; France, Nov. 19, 2009 (am/pm), p. 83:11-15; France Rebuttal, ¶ 93.

116.    The undisputed evidence also establishes that ATS reduced this idea to practice in 2001 during testing of ATS 2001 Prototype.  At a minimum, ATS has proven so by a preponderance of the evidence.

117.    For present purposes, the Court need not question AMI's contention that Dr. Brillhart independently conceived of the two-phase mist scheme.  (AMI PFFCL, ¶¶ 30-31, 60-75.)  Dr. Brillhart's alleged contributions to the inventions of Claims 3 and 4 in 2003 and 2004 are irrelevant because, even if true, those alleged contributions occurred years after ATS had created, conceived, and first reduced to practice those inventions.

118.    Accordingly, Dr. Brillhart did not contribute to the creation, conception, or first reduction to practice of maintaining a two-phase refrigerant throughout the thermal load.

119.    The Court did not find Dr. Brillhart credible with regard to his conception of direct expansion, and questioned his credibility.[7]  His ungracious

---

[7]There were a number of instances where his testimony was disingenuous, if not outright

demeanor while testifying, particularly on cross examination, suggested a defensiveness calling into question his trustworthiness.

120.    Dr. Brillhart testified that he had an "epiphany" in his cubicle and independently conceived of the direct expansion idea.  Brillhart, ¶¶ 17-24

121.    Despite having signed summary judgment and trial declarations on this subject, Dr. Brillhart testified for the first time at trial that he conceived of his direct expansion idea "within a few days" of April 29, 2003.  Brillhart, Nov. 17, 2009 (pm), pp. 24:11-25:1.

122.    However, this was contradicted by his direct testimony in which he testified that he conceived of the direct expansion idea in "mid-to-late 2003." Brillhart, ¶¶ 11, 24.  He was further contradicted by his July 20, 2009 declaration, and his deposition testimony, in which Dr. Brillhart testified that he conceived of the direct expansion idea in October 2003.   Ex. 1020, ¶¶ 14, 20; Brillhart, Nov. 17, 2009 (pm), pp. 28:1-30:6.

123.    Dr. Brillhart testified that, immediately after having his alleged epiphany, he discussed the idea with Fovell.  Brillhart, ¶¶ 24-25.  Fovell testified that this discussion, which Fovell referred to as the "aha moment," occurred in either "late 2003" or at the "end of 2003."  Fovell, Nov. 18, 2009 (pm), pp. 107:23-109:21; Fovell, Nov. 19, 2009 (am), pp. 11:7-12:8, 12:25-13:18.

---

misleading. See Findings of Fact, ¶¶ 125, 128, 175.

124.    AMI's Rule 30(b)(6) witness, Robert Larisch ("Larisch"), similarly testified that Dr. Brillhart's epiphany occurred in October 2003.  Larisch Depo., p. 132:9-16.

125.    Similarly, in his trial testimony, Dr. Brillhart alleged for the first time that a meeting relating to the TDSF technology occurred in May 2003, with Fovell, Goyins, and possibly Christoffersen.  Brillhart, ¶ 34; Brillhart, Nov. 17, 2009 (pm), pp. 56:12-57:8.  However, Dr. Brillhart did not mention this meeting in the declaration that he submitted to the Court in July 2009, or in either of his depositions.  Ex. 1020, ¶ 23.

126.    To the extent Dr. Brillhart did discuss the direct expansion idea with Fovell, such discussion did not occur any earlier than the end of 2003.

127.    *Lack of Documentary Corroboration.*  The only documentary evidence AMI offered as allegedly supporting Dr. Brillhart's conception prior to May 2004, is a single entry in Dr. Brillhart's laboratory notebook dated June 2003.  However, this entry does not provide any independent corroboration of Dr. Brillhart's testimony.

128.    Dr. Brillhart testified that the notation in his lab notebook that states "x – range is critical" reflects his conception of the direct expansion idea.  Brillhart, ¶ 232; Ex. 660, p. 1.  However, at his deposition, Dr. Brillhart was specifically shown the pages of his notebook that contains the "x – range is critical" and "R404" references.  Brillhart, Nov. 17, 2009 (pm), pp. 50:23-51:2.  At that time, Dr. Brillhart did not know what these entries were referring to.  Id.  Dr. Brillhart's testimony that his inability to identify these entries as relating to the direct

34

expansion technology stemmed from being tired at his deposition is unpersuasive. Brillhart, Nov. 17, 2009 (pm), pp. 50:23-51:2.  The Court does not find this convincing given the asserted significance of the entries.   This is akin to Archimedes forgetting what he meant when he proclaimed "Eureka."

129.   Dr. Brillhart conceded that there is no reference to "direct expansion" on these pages, there is no reference to a single-loop chiller, there are no Molliere diagrams, and no other portion of the lab notebook entry relates to direct expansion. Brillhart, Nov. 17, 2009 (pm), pp. 50:13-22, 55:9-20, 55:18-25, 62:13-24; see also Jacobi Rebuttal, ¶ 115 (testifying that nothing in Dr. Brillhart's lab notebook entry indicates that it relates to the direct expansion technology).

130.   In fact, Dr. Brillhart was unable to identify any page in his lab notebook that reflected his alleged epiphany.  Brillhart, Nov. 17, 2009 (pm), p. 53:2-5.

131.   Likewise there is no reason to conclude that this reference to quality was necessarily a reference to directly transferring refrigerant to the semi tool.  At the time of this entry, AMI was using refrigerants in other chiller products. Brillhart, Nov. 18, 2009 (pm), p. 57:4-7; Fovell, Nov. 19, 2009 (am), p. 63:13-23.

132.   Dr. France conceded that there is nothing in Dr. Brillhart's lab notebook that indicates that these entries have anything to do with flowing two-phase refrigerant through an electrostatic chuck.  France, Nov. 19, 2009 (am/pm), p. 104:6-10.

133.    The only reason Dr. France thought those entries had anything to do with the technology at issue in this case is that Dr. France accepted Dr. Brillhart's word that the entries related to direct expansion.  France, Nov. 19, 2009 (am/pm), p. 104:11-15.

134.    Fovell is not aware of any evidence that documents the "aha moment" with Dr. Brillhart.  Fovell, Nov. 19, 2009 (am), p. 35:21-24.

135.    Dr. Brillhart is similarly unaware of any documents reflecting that he conveyed his direct expansion idea to ATS.  Brillhart, Nov. 17, 2009 (pm), p. 56:5-7.

136.    Thus, no documentary evidence of any kind shows that Dr. Brillhart or Fovell made any contribution to maintaining a two-phase flow throughout the thermal load before May 2004.

137.    *Lack of Contribution re Two-Phase Flow.*  Dr. France testified that AMI's contribution was that the TDSF system had to maintain a two-phase refrigerant throughout the thermal load "at all times."  France Resp., ¶ 79.

138.    However, Dr. Brillhart's trial testimony directly contradicts Dr. France's opinion.  Dr. Brillhart testified that it is "physically impossible to have two-phase flow at all times."  Brillhart, Nov. 17, 2009 (pm), pp. 44:23-45:21. Indeed, Dr. Brillhart's own description of the technology in an industry conference paper reflects that, depending on the operating parameters, the system will supply all liquid or a liquid-vapor mixture to the tool, and that at the outlet of the tool the

refrigerant may be all liquid, a liquid-vapor mixture, or all gas.  Ex. 5, pp. 1, 2; Brillhart, Nov. 17, 2009 (pm), pp. 46:3-48:8.

139.   Dr. France testified that AMI made an inventive or creative contribution to the inventions of Claims 3 and 4 of the '835 Patent because Dr. Brillhart conceived of the idea of maintaining the refrigerant in the "mist flow regime" throughout the thermal load.  France, ¶ 184; Docket No. 842, p. 1 (Order excluding Dr. France's opinion that Fovell made a contribution to Claims 3 and 4 of the '835 patent).

140.   Dr. France bases his opinion on so-called "mist flow calculations" in Fovell's lab notebook.  France, ¶ 95.

141.   However, Dr. France conceded that all of  Fovell's notebook calculations are consistent with the idea that  Fovell was merely calculating the required inlet quality for various chuck designs in order to achieve a particular outlet quality, and there is nothing in any of those calculations about using any particular flow regime.  France, Nov. 20, 2009 (pm), p. 16:10-21; see also Jacobi Rebuttal,  ¶ 106 (Fovell's calculations do not reference any flow regime, and do not make reference to a flow map or the other parameters necessary to determine the flow regime).

142.   In addition, Dr. France agreed that there was nothing in Fovell's lab notebook indicating whether he was performing the calculations identified by Dr. France based on an idea that  Fovell got from ATS as opposed to an idea that Fovell or Dr. Brillhart had.  France, Nov. 19, 2009 (am/pm), p. 106:11-15.

143.   As this Court has noted, it is one thing to do calculations; it is another to make an inventive or creative contribution.  Docket No. 842, p. 1.

144.   Moreover,  Fovell's lab notebook entries, which are all dated after February 2004, are irrelevant.  This Court previously recognized the mist flow concept was disclosed in ATS's February 19, 2004 provisional application.  Docket No. 352, p. 10.  Accordingly, even if  Fovell's calculations did relate to the mist flow regime, "the Court attributes very little probative value to the fact that Fovell was conducting quality ratio calculations well after the date of the provisional application."  Id.

145.   *Unreliable Opinions.*  Many of Dr. France's  fundamental opinions bearing on ownership of the '835 Patent are based solely on the oral communications or  testimony of Dr. Brillhart and Fovell.  E.g., France, Nov. 19, 2009 (am/pm), p. 107:11-109:13 (Dr. Brillhart's conception of the idea that the refrigerant in the electrostatic chuck base should be in the two-phase state throughout the base to promote temperature uniformity);  France, Nov. 19, 2009 (am/pm), pp. 109:14-25, 112:7-11 (AMI conception of using the mist flow regime exclusively throughout the electrostatic chuck base); France, Nov. 19, 2009 (am/pm), pp. 112:22-113:9, 114:14-24.  Given the Court's reservations about Dr. Brillhart's credibility and the inconsistencies in Fovell's testimony, Dr. France 's expert opinions bear the flaws of the underlying source for those opinions.

146.   There is no documentary evidence that AMI made any contribution to any aspect of the inventions of Claims 3 and 4 of the '835 Patent, and no evidence that any putative contributions were made before ATS created, conceived, and first

reduced to practice the subject matter of those claims.

147.   Accordingly, the Court finds that AMI made no "inventive or creative contribution" to the inventions of Claims 3 and 4 of the '835 Patent.  Thus, those inventions are ATS's Pre-Existing IP.   As a result, ATS is the sole owner of the '835 Patent.

III.   Ownership of AMI's Ten Patent Applications.

148.   As previously described, it is undisputed that ATS created and conceived of the idea of using a semiconductor tool, and specifically an electrostatic chuck, as an evaporator in a refrigeration loop in 2000 and 2001 when Ken Cowans conceived of his TDSF system.

149.   Dr. France conceded that the text of Ken Cowans' 2001 invention disclosure to ATS's patent attorney discloses using the semiconductor tool, including the electrostatic chuck, as an evaporator in a refrigeration loop.  France, Nov. 19, 2009 (am/pm), pp. 84:22-85:3, 85:16-87:11.

150.   Following the testing of its TDSF prototype, ATS disclosed the TDSF technology to AMI.

151.   An e-mail dated November 29, 2001, in which Goyins conveys questions from AMI's Fovell to Thayer and Ken Cowans, indicates that ATS disclosed its "direct expansion" concept to Fovell at least as of this date.  Ex. 1193. The e-mail specifically refers to the technology as the "direct expansion idea" and

conveys the question, "[h]ow would you handle the refrigerant in the chucks when they need to be changed out?" Ex. 1193, p. 2. This suggests that ATS disclosed its concept of eliminating the secondary process fluid loop and delivering refrigerant directly to the electrostatic chuck to Fovell at least as early as November 2001.

152.   Fovell testified that the reference to direct expansion in this e-mail refers to two-phase flow in an electrostatic chuck. Fovell, Nov. 19, 2009 (am/pm), pp. 22:22-23:1.

153.   Accordingly, ATS disclosed its idea of using two-phase refrigerant in an electrostatic chuck – which necessarily results in the electrostatic chuck functioning as an evaporator while the electrostatic chuck is being cooled – to Fovell and AMI before November 29, 2001.

154.   This 2001 e-mail is also consistent with Ken Cowans' testimony that he referred to the TDSF technology by various names, including "direct expansion," and is consistent with the reference to "direct expansion" in Ken Cowans' lab notebook in August, 2000. K. Cowans, ¶ 27; Ex. 150, p. 27.

155.   This e-mail also contradicts the testimony of Fovell and Dr. Brillhart, who claim to have given the technology this name in late 2003. Brillhart, ¶¶ 16-29; Fovell, ¶ 49.

156.   *November 2002 Presentation.* In November 2002, Ken Cowans and Goyins formally presented the Transfer Direct concept to Brian Lue and Fovell at AMI. K. Cowans, ¶¶ 47-48; Goyins, ¶¶ 13-14; Ex. 1128.

157.   The PowerPoint slides shown by ATS during the November 2002 presentation disclosed six distinct temperature control concepts.  Ex. 1128; K. Cowans, ¶ 49; Goyins, ¶ 14; Thayer, ¶ 16;  Jacobi, ¶ 41.  The presentation devotes two pages to each of the six technologies.  Ex. 1128; Goyins, ¶ 14.  The first page for each technology is an illustration, and the second page for each technology identifies features or characteristics.  Ex. 1128; K. Cowans,  ¶ 49; Goyins, ¶ 14.

158.   ATS's November 2002 presentation described the Transfer Direct system as "[e]liminat[ing] pumped process fluid" and "[t]ransfer[ring] refrigerant directly to Semi tool."  Ex. 1128, pp. 2, 4; K. Cowans, ¶ 51; Goyins, ¶ 15.

159.   The November 2002 presentation also contains a drawing of the Transfer Direct system showing "lines carrying liquid/vapor" connecting the temperature control system ("TCS") to the Semi tool.  Ex. 1128, p. 3.  This description distinguished the Transfer Direct system from ATS's conventional chillers, which carried only liquid in the lines to and from the semi tool.  K. Cowans, ¶ 53.

160.   Dr. Jacobi testified that a person familiar with temperature control systems and chiller technology would understand the Transfer Direct concept, as described in the November 2002 presentation, to refer to a chiller without a secondary loop.  Jacobi, ¶ 41.  Dr. Jacobi further testified that the presentation "would indicate, to a person familiar with refrigeration systems, that the concept being disclosed was a single-loop chiller system that eliminated the secondary loop and utilized the semi tool as an evaporator."  Id.

41

161.   Dr. Jacobi further explained that conventional chillers provide the refrigerant to the heat exchanger as a liquid-vapor mixture, and that absent some indication to the contrary, a person familiar with refrigeration technology would expect that a similar strategy was being utilized in the Transfer Direct system, "where the semi tool is a heat exchanger serving as a surrogate evaporator (in the cooling mode)." Id., ¶ 42.

162.   Dr. France agreed that the Transfer Direct System disclosed in the November 2002 presentation discloses flowing two-phase refrigerant through the electrostatic chuck.  France, Nov. 20, 2009 (am), p. 13:4-19.

163.   Dr. Brillhart also testified that the description of the Transfer Direct System in the November 2002 presentation disclosed the use of the semi tool as an evaporator: he understood the reference to "lines carrying liquid/vapor" in the presentation to refer to "liquid in one, vapor coming out the other," which requires the tool to be acting as an evaporator.  Brillhart, Nov. 17, 2009 (pm), p. 84:19-20.

164.   Thus, the November 2002 presentation slides, standing alone, disclosed the use of the semi tool as an evaporator.

165.   While making the November 20, 2002 presentation to AMI, Ken Cowans described that the Transfer Direct technology used a two-phase refrigerant and the tool as an evaporator.  K. Cowans, ¶ 53; Goyins, ¶ 16.

166.   Goyins' practice was to take detailed notes during meetings with current and potential customers, and to later type these notes into "Call Reports" that

42

he circulated to the meeting attendees for review.  Goyins, ¶¶ 9-10.

167.   Goyins' Call Report from the November 20, 2002 presentation is consistent with Ken Cowans' and Goyins' testimony that the Transfer Direct system was discussed during the meeting, and confirms that ATS disclosed transferring refrigerant directly to the cathode (electrostatic chuck).  Ex. 46; Buchberger, Nov. 12, 2009, pp. 193:24-194:5 ("cathode" refers to the electrostatic chuck).

168.   Fovell agreed that the reference in Goyins' notes to the question of "[h]ow to auto purge out of cathodes and to where?" under the heading Transfer Direct, (Ex. 1178, p. 17), referred to delivering refrigerant directly to the electrostatic chuck.  Fovell, Nov. 19, 2009 (am), pp. 61:8-63:2.

169.   Dr. France was unable to identify any aspect of Ken Cowan's description of what was presented during the November 2002 presentation with which Dr. France disagreed.  France, Nov. 19, 2009 (am/pm), p. 94:16-23.

170.   Ken Cowans' and Goyins' testimony that Ken Cowans orally presented the Transfer Direct system as using the tool as an evaporator, was not cross-examined and is undisputed.

171.   The Court finds Ken Cowans' and Goyins' testimony regarding the November 2002 presentation to be credible and consistent with the documentary evidence.

172.   Without explaining how or why a person of skill in the art would

interpret the presentation, Dr. France testified that the Transfer Direct concept "replaced" the pumped process loop from conventional chillers with an "unpumped ammonia system." France, ¶ 146. In contrast, Dr. Jacobi provided a reasoned analysis as to why a person of skill in the art would not interpret the presentation in the manner proposed by Dr. France. Jacobi Rebuttal, ¶¶ 74-77.

173. Dr. France's understanding of the November 2002 presentation is inconsistent with the description of the November 2002 presentation that Dr. Brillhart provided in his trial declaration. France, Nov. 20, 2009 (am), p. 19:19-22.

174. Dr. France's understanding of the November 2002 presentation is also inconsistent with Fovell's current understanding of the presentation. Compare France, Nov. 19, 2009 (am/pm), pp. 88:16-89:6 with Fovell, Nov. 19, 2009 (am), pp. 43:7-46:5.

175. Dr. Brillhart admitted at trial that his original understanding of the November 2002 presentation, namely that the presentation disclosed a single concept that combined the Transfer Direct concept and the Isothermal Platen concept, was incorrect. Brillhart, Nov. 17, 2009 (pm), pp. 73:20-25, 83:10-15 ("I agree that I went straight to the isothermal platen and erroneously linked everything up to it."), 84:7-11 (recognizing the contradictory nature of using a wicking system with ammonia and eliminating the process fluid in a single-loop system, and admitting that he may have misinterpreted ATS's November 2002 presentation). Despite the fact that Dr. Brillhart knew by at least July 2009 that his understanding of the November 2002 presentation was incorrect (Brillhart, Nov. 18, 2009 (am), pp. 9:1-10:25), he perpetuated that misunderstanding in his trial declaration dated

November 3, 2009.  Brillhart, ¶¶ 34-36.  Given the significance, perhaps overwhelming significance, of the November 2002 presentation, the Court found a lapse of candor in Dr. Brillhart's trial declaration that contributed to the Court's general wariness of the accuracy of Dr. Brillhart's testimony.   In particular, in November 2009, he could not credibly state: "The fact that ATS was proposing a very peculiar ammonia-based heat exchanger inside of the electrostatic chuck demonstrated to me that my direct expansion idea was new to ATS. . . . The ATS presentation described a system very different from the system I had conceived." Brillhart, ¶¶ 35, 41.

176.   Accordingly, the Court finds Dr. France's interpretation of the November 2002 presentation was unreliable.

177.   The Court finds that ATS disclosed its Transfer Direct concept, including the use of the electrostatic chuck as an evaporator, to AMI in November 2002.

178.   There is no evidence that AMI was aware of the concept of using the electrostatic chuck as an evaporator before ATS disclosed this idea to AMI in November 2002.

179.   *Combining TDSF with AMI SemiTools.*  In November 2002, ATS proposed that AMI use ATS's Transfer Direct concept with AMI's "semi tools." Ex. 1128, pp. 1, 3, 4.

180.  When Ken Cowans proposed ATS's Transfer Direct system to AMI in

November 2002, Ken Cowans was familiar with the general semiconductor fabrication processes and equipment.  K. Cowans,  ¶ 58.  Ken Cowans and ATS had been developing temperature control systems for these processes and equipment for approximately seven years.  Id., ¶ 57.

181.   At that time, semiconductor tools having electrostatic chucks to support wafers being processed in plasma etch chambers were well known, and Ken Cowans was familiar with such tools.  Id., ¶ 58; Glew Amended, ¶ 19.

182.   In November 2002, the use of a backside gas for temperature control was also well known in the semiconductor industry, and Ken Cowans was familiar with this concept.  K. Cowans, ¶ 59; Glew Amended, ¶ 22.

183.   Ken Cowans described these aspects of conventional semiconductor technology in a patent application he filed in June 2002.  Ex. 1350, pp. 1, 7.

184.   Conventional plasma etch technology, including electrostatic chucks and backside gas temperature control, was so well known in 2002 that Ken Cowans' 2002 patent application stated that a detailed description of the plasma etch chamber and process was not necessary.  Ex. 1350, p. 7.

185.   In November 2002, the use of feedback and feedforward control systems, including the use of thermal modeling, were well known in the semiconductor industry and Ken Cowans was familiar with these techniques for controlling the temperature control systems used with semiconductor equipment.  K. Cowans, ¶ 61; Glew Amended, ¶ 31.

186.    The use of multiple zones in the base of the electrostatic chuck was also well known in the semiconductor industry by November 20, 2002.  Glew Amended, ¶ 26.

187.    When Ken Cowans' proposed the Transfer Direct system to AMI's Etch department in November 2002, he suggested that AMI use the Transfer Direct system with AMI's existing etch equipment.  K. Cowans, ¶ 62.

188.    Ken Cowans understood that AMI's etch equipment included the typical components used in the industry, such as a processing chamber, an electrostatic chuck, an RF power source, a controller (that might use feedforward and/or feedback control), and a backside gas pressure control system.  Id.

189.    ATS proposed to AMI, in 2002, the combination of the TDSF technology with the etch processing tools that were then in use at AMI and in the industry generally, including plasma reactors.  Id.; Glew Amended, ¶ 10.

190.    ATS's promotion of its TDSF technology to other companies in the semiconductor industry confirms that ATS knew its TDSF technology could work with various types of semiconductor tools and intended its TDSF technology to be combined with those tools.  K. Cowans, ¶¶ 63-64; Glew Amended, ¶ 44; Ex. 394 (Lam Research presentation); Ex. 48 (TSMC presentation).

191.    A person with experience in the semiconductor industry would understand the term "semi tool," as used in the November 2002 presentation, to refer to semiconductor tools, including process chambers and electrostatic chucks,

having various conventional features, such as multiple temperature control zones, the use of backside helium gas, and the use of feedforward and feedback control techniques based on thermal modeling.  Glew Amended, ¶¶ 41-42.

192.   Buchberger similarly testified that the term "semi tool" is a term used in the semiconductor industry to refer to a variety of tools, including etch tools. Buchberger, Nov. 12, 2009, pp. 134:18-135:9..

193.   Dr. Glew's testimony regarding how someone familiar with the industry would have understood ATS's disclosure of using the Transfer Direct technology with a semi-tool was uncontroverted.

194.   Therefore, it is undisputed that, when Ken Cowans proposed the combination of ATS's TDSF technology with AMI's "semi tools," Cowans was proposing the combination of the TDSF technology with AMI's plasma reactors, which included an electrostatic chuck, backside helium control, and the use of feedforward and feedback control techniques based on thermal modeling.

195.   *ATS's Continued Proposals of TDSF.*  After disclosing the TDSF technology to AMI for use with AMI's semiconductor tools in November 2002, ATS continued to discuss the TDSF technology with AMI during 2003.

196.   On January 22, 2003, Goyins sent an e-mail to Fovell, Lue, and Ken Cowans, and copying Carl Hughes, Thayer, Christoffersen, and Dr. Brillhart, that attached a copy of the PowerPoint slides from the November 2002 presentation and Goyins' Call Report notes from that meeting.  Ex. 1178.

197.   As of January 22, 2003, Lue and Fovell had spoken with Dan Hoffman, the Director of Engineering at AMI, and Goyins understood that AMI had serious interest in the Transfer Direct technology.  Goyins, ¶ 19; Ex. 1178.

198.   Fovell testified that the November 2002 presentation (Ex. 1128) and the January 22, 2003 e-mail with attachments (Ex. 1178) were sent to AMI's Lue and Dr. Brillhart, along with himself, before the alleged "aha moment" occurred in late 2003.  Fovell, Nov. 19, 2009 (am), p. 58:3-11.  <u>This fact is critical and is uncontroverted.</u>[8]

199.   On February 20, 2003, Goyins had a brief hallway meeting with Fovell and Bidu Pitata in which Fovell or Pitata expressed that the Transfer Direct presentation was a very good idea that might have been before its time, and that it really needed to be sold to someone higher up at AMI because the concept had the ability to give AMI a technology difference that they liked.  Goyins, ¶ 21; Ex. 69.

200.   On April 29, 2003, Christoffersen sent a letter to Fovell again proposing the Transfer Direct technology.  Ex. 18; Ex. 289; Christoffersen, ¶¶ 9-12. Fovell knew from Christoffersen's proposal that the Transfer Direct technology involved flowing refrigerant directly to the semi tool to cool the electrostatic chuck. Fovell, Nov. 19, 2009 (am), pp. 71:15-72:2, 74:23-75:9.

---

[8]The "aha moment" occurred after Fovell transferred to Dr. Brillhart's group. "[Exhibit 1178 is] certainly dated before I transferred over to Paul [Brillhart]."  Fovell, Nov. 19, 2009 (am), p. 58:6-11.

201.   On May 15, 2003, Goyins sent an e-mail regarding the Transfer Direct technology to Dr. Brillhart, Fovell, and copying Christoffersen and Ken Cowans, which reflects that Fovell had mentioned to Goyins that there was interest in continuing the dialogue on TD (Transfer Direct), and Goyins responded by suggesting a follow-up meeting with Fovell and Dr. Brillhart.  Goyins, ¶ 22; Ex. 88.

202.   Fovell testified that Goyins was pushing the Transfer Direct technology on Fovell and others at AMI.  Fovell, Nov. 19, 2009 (am), pp. 77:8-13, 79:17-25.

203.   The same day, Fovell sent a responsive e-mail stating that the proposed meeting would be great if the non-disclosure agreements were all set, and that Dr. Brillhart said it was time to start.  Goyins, ¶ 23; Ex. 92.

204.   Neither Fovell nor Dr. Brillhart contend that the "TD" referenced in this e-mail was a dual-loop ammonia system.  Brillhart, Nov. 18, 2009 (am), p. 70:1-16; Fovell, Nov. 19, 2009 (am), pp. 81:3-82:12.

205.   Dr. France agreed that the 2003 e-mails between Goyins and Fovell regarding AMI's interest in the Transfer Direct technology are inconsistent with the idea that Dr. Brillhart and/or Fovell created or conceived of the technology.  France, Nov. 19, 2009 (am/pm), p. 119:20-24.

206.   On September 24, 2003, Goyins had a meeting with Fovell and Dr. Brillhart during which Goyins asked Fovell whether he was still interested in the Transfer Direct expansion technology and Fovell answered that there was still active interest.  Goyins, ¶ 24; Ex. 89.

207.   These ongoing communications throughout 2003 confirm that ATS disclosed the TDSF technology to AMI for use with AMI's semiconductor tools in late 2002, and are inconsistent with Dr. Brillhart and/or Fovell having created or conceived of the technology subsequently in 2003.

208.   *ATS's Proposed Use of AMI Chuck as Evaporator.*   ATS also proposed to AMI using the TDSF technology with AMI's semiconductor tools in early 2004, which was still before any alleged documentary evidence of AMI contributions.

209.   On January 19, 2004, Christoffersen responded to AMI's request to see a technology demonstrator by stating that ATS's "proof of concept" was "developed and built over two years ago," and had since been cannibalized for other projects. Ex. 313; Christoffersen, ¶ 15.

210.   On February 20, 2004, Ken Cowans gave another presentation on the TDSF system to AMI.   K. Cowans, ¶ 66; Ex. 21.

211.   This presentation described the same TDSF system that ATS had tested in 2001 and presented to AMI in November 2002.   K. Cowans, ¶ 66.

212.   The February 20, 2004 presentation contains a schematic diagram of ATS's TDSF system.   Ex. 21, p. 3.

213.   There is no dispute that the February 20, 2004 presentation discloses a system that uses the semi tool as an evaporator as AMI admits that it described the TDSF or "direct expansion" technology.   Brillhart, Nov. 18, 2009 (am), p. 72:10-12.

214.   AMI used the schematic diagram from ATS's February 20, 2004 presentation to describe the TDSF technology internally at AMI and to AMI's customers at least until October 2007.  Ex. 5, p. 2;  Ex. 292, p. 3; Ex. 197, p. 10; Ex. 363, p. 18; Ex. 364, p. 28; Ex. 267, p. 6.

215.   AMI did not contribute to the creation, conception, or first reduction to practice of the TDSF system described in the February 20, 2004 presentation.

216.   AMI did not independently conceive of the concept of using the electrostatic chuck as an evaporator prior to ATS's February 20, 2004 presentation.

217.   ATS made an inventive or creative contribution to AMI's ten patent applications because at least one claim in each application expressly claims using the electrostatic chuck as an evaporator in the refrigeration loop.

218.   Aspects of the TDSF technology that ATS invented and disclosed to AMI on November 20, 2002 and February 20, 2004 are claimed in each of the AMI patent applications.  Jacobi, ¶ 56; see also Brillhart, Nov. 18, 2009 (am), p. 60:24-61:3.

219.   Dr. France agreed that the claims of the AMI patent applications at issue claim the use of the electrostatic chuck as the evaporator in a refrigeration loop, among other limitations.  France, Nov. 20, 2009 (am), pp. 5:22-6:2; 7:3-7.

220.   AMI's patent attorneys have similarly argued that the claims of the AMI patent applications claim the use of the electrostatic chuck as the evaporator in

a refrigeration loop.  Ex. 602, pp. 260-62; Ex. 600, pp. 210-13.

221.  The Court now reviews each of the AMI applications in dispute, but first makes several findings applicable to all the applications.  First, the fact that ATS's creative contribution to these applications is limited, almost exclusively, to TDSF technology does not diminish its entitlement to joint ownership on the basis of that contribution.  Said another way, the fact that AMI's creative contributions to these application were extensive, or even predominant, does not vitiate the force of ATS's contributions.[9]  Thus while AMI's catalogue of its contributions is impressive,[10] it is not determinative.  Second, AMI's cancellation of certain claims involving TDSF technology does not moot the dispute because ATS has and had the right to participate in the decision making with regard to Jointly Developed IP, such as the applications, including the decision to file, the decision to withdraw, and the decision to refile or reinstate.  Ex. 1, p. 17, Sched. 3, § 2.

222.  *The '559 Application.*  Claims 1 and 8 of the '559 application claim the combination of aspects of ATS's TDSF technology with previously existing

_____

[9]There are numerous claims in the applications to which ATS made no contribution.  See AMI PFFCL, ¶¶ 306 ('333 application), 343 ('557 application), 367 ('359 application), 394 ('567 application), 412 ('183 application), 444 ('184 application), 468 ('292 application), 489 ('326 application), 519 ('782 application), 542 ('859 application).  Moreover, AMI made contributions to the claims which include ATS technology.  AMI PFFCL, ¶¶ 327, 329 ('333 application), 356 ('557 application), 379-81 ('359 application), 404-05 ('567 application), 425-27 ('183 application), 463 ('184 application), 500-02 ('326 application), 553-54 ('859 application).

[10]See preceding footnote.

semiconductor tool technology.  Glew Amended, ¶ 60, p. 19:17-19; Ex 1244, pp. 50-51.

223.    Claims 1 and 8 of the '559 application claim "inner and outer evaporators inside respective inner and outer zones of said electrostatic chuck and a refrigeration loop having respective inner and outer expansion valves for controlling flow of coolant through said inner and outer evaporators respectively."  Ex 1244, pp. 50-51.  An evaporator inside an electrostatic chuck and a refrigeration loop having an expansion valve for controlling the flow of coolant through the evaporator is the concept that ATS developed and disclosed to AMI.  Jacobi, ¶ 59.

224.    Moreover, as Buchberger conceded at trial, the use of multiple temperature zones in an electrostatic chuck was not a new concept when AMI filed its patent applications.  Buchberger, Nov. 12, 2009, p. 166:15-22.

225.    The additional limitations in Claims 1 and 8 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: inner and outer zones of said electrostatic chuck, dual backside gas pressure control, dual temperature sensors within the chuck, and a feedforward/feedback control system.  Glew Amended, ¶ 62, pp. 19:27-20:7.

226.    Claim 1 of the '559 application was withdrawn on March 13, 2009 during prosecution and is no longer being considered for patentability.  Ex. 600, p.

350.  Claims 1-7 were withdrawn following an Election Restriction Office Action issued by the United States Patent Office.  Id.   The cancellation has no effect of ATS's right to a declaration of ownership.

227.   ATS made an inventive or creative contribution to Claims 1 and 8 of the '559 application.

228.   AMI did not independently conceive of the element in Claims 1 and 8: "inner and outer evaporators inside respective inner and outer zones of said e-chuck and a refrigeration loop having respective inner and outer expansion valves for controlling flow of coolant through said inner and outer evaporators respectively," without inventive or creative input from ATS.

229.   *The '558 Application.*  Claims 2 and 11 of the '558 application claim the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 64, p. 20:11-13; Ex. 1242, p. 50.

230.   Claim 2 of the '558 application claims "providing an evaporator of a refrigeration loop within said electrostatic chuck; circulating coolant in the refrigeration loop through an expansion valve to an inlet of the evaporator; controlling the orifice size of the expansion valve to maintain the temperature and pressure of the coolant within said evaporator within a two-phase regime in which both liquid and vapor phases of said coolant exist, whereby heat transfer with said evaporator is through the latent heat of vaporization of said coolant." Ex. 1242, p. 50.  Claim 11 of the application claims "maintaining coolant flowing through an evaporator inside said electrostatic chuck in a liquid-vapor mixed phase." Id.  Both

of these claims claim the technology that ATS developed and disclosed to AMI. Jacobi, ¶ 60.

231.   The additional limitations in Claim 2, Claim 1 from which it depends, and Claim 11 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: an electrostatic chuck, backside gas pressure control, measuring the workpiece temperature, and a feedback temperature control system to control the backside gas pressure.  Glew Amended, ¶ 65, p. 21:1-9.

232.   ATS made an inventive or creative contribution to dependent Claim 2 and independent Claim 11 of the '558 application.

233.   AMI did not independently conceive of the element in Claim 2: "providing an evaporator of a refrigeration loop within said e-chuck; circulating coolant in the refrigeration loop through an expansion valve to an inlet of the evaporator; controlling the orifice size of the expansion valve to maintain the temperature and pressure of the coolant within said evaporator within a two-phase regime in which both liquid and vapor phases of said coolant exist, whereby heat transfer with said evaporator is through the latent heat of vaporization of said coolant," without inventive or creative input from ATS.

234.   AMI did not independently conceive of the element in Claim 11:

"maintaining coolant flowing through an evaporator inside said e-chuck in a liquid-vapor mixed phase" without inventive or creative input from ATS.

235.  *The '567 Application.*  Claims 1 and 8 of the '567 application claim the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 69, p. 21:13-15; Ex. 1246, p. 50.

236.  Claims 1 and 8 of the '567 application claim "an evaporator inside said electrostatic chuck and a refrigeration loop having an expansion valve for controlling flow of coolant through said evaporator," which is the technology that ATS developed and disclosed to AMI.  Ex. 1246, p. 50; Jacobi, ¶ 61.

237.  The additional limitations in Claims 1 and 8 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: an electrostatic chuck, backside gas pressure control, measuring the workpiece temperature, and a feedback temperature control system to control the backside gas pressure.  Glew Amended, ¶ 71, pp. 21:21-22:1.

238.  ATS made an inventive or creative contribution to Claims 1 and 8 of the '567 application.

239.  AMI did not independently conceive of the element in Claim 1: "an evaporator inside said e-chuck and a refrigeration loop having an expansion valve

for controlling flow of coolant through said evaporator," without inventive or creative input from ATS.

240.   AMI did not independently conceive of the element in Claim 8: "an evaporator inside said e-chuck and a refrigeration loop having an expansion valve for controlling flow of coolant through said evaporator," without inventive or creative input from ATS.

241.   *The '183 Application.*  Claim 1 of the '183 application claims the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 53, p. 18:6-8; Ex. 1225, p. 50.

242.   Claims 1 and 8 of the '183 application, as filed, specifically claim "an evaporator inside said electrostatic chuck and a refrigeration loop having an expansion valve for controlling flow of coolant through said evaporator."  Ex. 1225, p. 50. This is the technology that ATS developed and disclosed to AMI.  Jacobi, ¶ 57.

243.   The additional limitations in Claim 1 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: an electrostatic chuck, backside gas pressure control, a temperature sensor within the chuck, within said chamber for supporting a workpiece, memory storing the RF power schedule, a thermal model, and feedforward control.  Glew Amended,

¶ 54, p. 18:14-22.

244.    Claim 8 of the '183 application was withdrawn on January 16, 2009 during prosecution and is no longer being considered for patentability.  Claims 8-19 were withdrawn following an Election Restriction Office Action issued by the United States Patent Office.  Ex. 602, p. 372.  The cancellation has no effect of ATS's right to a declaration of ownership.

245.    ATS made an inventive or creative contribution to Claims 1 and 8 of the '183 application.

246.    AMI did not independently conceive  of the element in Claims 1 and 8: "an evaporator inside said e-chuck and a refrigeration loop having an expansion valve for controlling flow of coolant through said evaporator," without inventive or creative input from ATS.

247.    *The '184 Application.*  Claim 1 of the '184 applications claims the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 56, p. 18:26-28; Ex. 1234, p. 50.

248.    Claim 1 of the '184 application specifically claims "circulating a coolant through a refrigeration loop that includes inner and outer zone evaporators inside respective inner and outer zones of said electrostatic chuck."   Ex. 1234, p. 50.  Circulating a coolant through a refrigeration loop that includes an evaporator in the electrostatic chuck is the concept that ATS developed and disclosed to AMI. Jacobi, ¶ 58.

249.   The additional limitations in Claim 1 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: an electrostatic chuck having inner and outer zones, dual backside gas pressure control, dual temperature sensors within the chuck, and a feedforward control system.  Glew Amended, ¶ 58, p. 19:6-13.

250.   ATS made an inventive or creative contribution to Claim 1 of the '184 application.

251.   AMI did not independently conceive of the element in Claim 1: "circulating a coolant through a refrigeration loop that includes inner and outer zone evaporators inside respective inner and outer zones of said e-chuck," without inventive or creative input from ATS.

252.   *The '326 Application.*  Claims 1 and 8 of the '326 application claim the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 73, p. 22:5-7; Ex. 1238, p. 50.

253.   Claims 1 and 8 of the '326 application claim "circulating a coolant through a refrigeration loop that includes an evaporator inside said electrostatic chuck," which is the technology that ATS developed and disclosed to AMI.  Ex. 1238, p. 50; Jacobi, ¶ 62.

254.    The additional limitations in Claim 1 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: an electrostatic chuck, backside gas pressure control, measuring the workpiece temperature, and a feedforward temperature control system to control the thermal conditions of the coolant in the ESC or the backside gas pressure.  Glew Amended, ¶ 75, p. 22:13-21.

255.    Claims 1, 5, 8 and 16 were amended on June 23, 2008 in response to an Office Action by the United States Patent Office rejecting the original claims of the '326 application.   Ex. 604, pp. 186-193.  The rejection  has no effect of ATS's right to a declaration of ownership.

256.  ATS made an inventive or creative contribution to Claims 1 and 8 of the '326 application.

257.    AMI did not independently conceive of the element in Claims 1 and 8: "circulating a coolant through a refrigeration loop that includes an evaporator inside said e-chuck," without inventive or creative input from ATS.

258.    *The '292 Application.* Claim 1 of  the '292 application claims the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 48, p. 17:9-11; Ex. 1236, p. 22.

259.   Claim 1 of the '292 application claims "a refrigeration loop comprising: an evaporator inside said electrostatic chuck and having a refrigerant inlet and a refrigerant outlet; a compressor coupled at least indirectly to said outlet of said evaporator; a condenser coupled to an outlet of said compressor; and an expansion valve coupled between an output of said condenser and said inlet of said evaporator."  Ex. 1236, p. 22.  This is the technology that ATS developed and disclosed to AMI.  Jacobi, ¶ 64.

260.   The first three limitations of Claim 1 of the '292 application have been around for "many, many years," and are common tools that AMI employees used in their work.  The "new stuff" in Claim 1 was the use of a refrigeration loop having an evaporator inside the chuck.  Buchberger, Nov. 12, 2009, pp. 146:9-147:21.

261.   Buchberger in essence testified that whoever invented the portion of Claim 1 of the '292 application that relates to the refrigeration loop would be the inventor of that claim.  Buchberger, Nov. 12, 2009, pp. 149:23-150:3.  However, he attributed the invention to Dr. Brillhart, a conclusion with which the Court disagrees having found that Ken Cowans was the inventor.  See Finding of Fact, ¶¶ 71, 85, 112, 118, 138; Docket Nos. 352, 554.

262.   There is no dispute that the "refrigeration loop" referred to in Claim 1 is the "direct expansion" or "TDSF" technology.  Buchberger, Nov. 12, 2009, pp. 150:22-24.

263.   Buchberger testified that at the time the AMI patent applications were filed, he was not aware of any other chiller where the electrostatic chuck was used

as an evaporator.  Id., pp. 150:25-151:3.

264.    The only improvement recited in Claim 1 of the '292 application is the use of a chiller to improve the ability to control temperature.  Id., p. 159:8-23.  As Buchberger testified, "everything else [in Claim 1] is old."  Id., p. 159:13-14.

265.    The additional limitations in Claim 1 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: a plasma reaction chamber, an electrostatic chuck within said chamber for supporting a workpiece, and an RF plasma bias power generator coupled to apply RF power to said electrostatic chuck.  Glew Amended, ¶ 42, pp. 17:20-18:2.

266.    Claim 1 of the '292 application was cancelled on September 22, 2008, and therefore is no longer pending in the '292 application.  Ex. 815, p. 122.  The cancellation has no effect of ATS's right to a declaration of ownership.

267.    ATS made an inventive or creative contribution to Claim 1 of the '292 application.

268.    AMI did not independently conceive of the element in Claim 1: "an evaporator inside said e-chuck and having a refrigerant inlet and a refrigerant outlet," without inventive or creative input from ATS.

269.   *The '333 Application.*   Claim 3 of the '333 application claims the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.   Glew Amended, ¶ 81, pp. 23:22-24; Ex. 1240, p. 22.

270.   Claim 3 of the '333 application claims: "an evaporator inside said electrostatic chuck and having a thermal transfer medium inlet and a thermal transfer medium outlet; a compressor coupled at least indirectly to said outlet of said evaporator; a condenser coupled to an outlet of said compressor; and an expansion valve coupled between an output of said condenser and said inlet of said evaporator."   Ex. 1240, p. 22.   This is the technology that ATS developed and disclosed to AMI.   Jacobi, ¶ 65.

271.   The additional limitations in Claim 1, from which Claim 3 depends, were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.   These additional limitations include: an electrostatic chuck, backside gas pressure control, an RF plasma bias power generator coupled to apply RF power to the ESC, a temperature control probe, and a feedback temperature control system to control the backside gas pressure.   Glew Amended, ¶ 83, p. 24:5-14.

272.   Claim 3 of the '333 application was cancelled on May 11, 2009 during prosecution and is no longer pending.   Ex. 598, pp. 471-472.   Claim 3 was cancelled without prejudice following an Election Restriction Office Action issued

by the United States Patent Office.  Id.  Of the original claims, only Claims 1, 2, 4-6 and 13-21 remain in the '333 application.  Id., pp. 533-543.  The cancellation has no effect on ATS's right to declaratory relief.

273.   ATS made an inventive or creative contribution to dependent Claim 3 of the '333 application.

274.   AMI did not independently conceive of the element in Claim 3: "an evaporator inside said e-chuck and having a thermal transfer medium inlet and a thermal transfer medium outlet," without inventive or creative input from ATS.

275.   *The '782 Application.*  Claims 1 and 10 of the '782 application claim the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 77, p. 22:25-27; Ex. 1248, p. 22.

276.   Claims 1 and 10 of the '782 application claim: "transferring heat from or to said coolant by circulating said coolant through a refrigeration loop in which said internal flow channel of said workpiece support constitutes an evaporator of the refrigeration loop"; "maintaining thermal conditions of the coolant inside said evaporator within a range in which heat exchange between said workpiece support and said coolant is primarily or exclusively through the latent heat of vaporization of said coolant"; and "maintaining an at least nearly uniform temperature of the coolant throughout said evaporator during the step of transferring heat from or to the coolant in said evaporator."  Ex. 1248, p. 22.  This is the technology that ATS developed and disclosed to AMI.  Jacobi, ¶ 63.

277.   As Buchberger testified at trial, Claim 1 is specifically claiming "the DX and the two-phase flow."  Buchberger, Nov. 12, 2009, pp. 168:21-169:1.

278.   The additional limitations in Claims 1 and 10 were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: placing coolant in an internal flow channel of a workpiece support in an RF-coupled plasma reactor.  Glew Amended, ¶ 79, p. 23:11-18.

279.   Claims 1 and 10 of the '782 application were amended on March 5, 2009 to overcome a rejection in view of prior art from October 28, 2008.  Ex. 605, pp. 115-137, 236-39.

280.   Claims 2-9 and 11-23 were cancelled as part of the response to the Patent Office's Non-Final Rejection on March 5, 2009, and new Claims 24-29 were added.  New Claims 24-26 depend on Claim 1, as amended, and new Claims 27-29 depend on Claim 10, as amended.  Id., pp. 232-39.

281.   Of the original claims, only Claims 1 and 10 in the '782 application remain, and these claims have been substantially amended.  Id., pp. 232-33.

282.   These post-filing events have no effect of ATS's right to declaratory relief.

283.   ATS made an inventive or creative contribution to Claims 1 and 10 of the '782 application.

284.   AMI did not independently conceive of the elements in Claim 1: "transferring heat from or to said coolant by circulating said coolant through a refrigeration loop in which said internal flow channel of said workpiece support constitutes an evaporator of the refrigeration loop" and "maintaining thermal conditions of the coolant inside said evaporator within a range in which heat exchange between said workpiece support and said coolant is primarily or exclusively through the latent heat of vaporization of said coolant," without inventive or creative input from ATS.

285.   AMI did not independently conceive of the elements in Claim 10: "transferring heat from or to said coolant by circulating said coolant through a refrigeration loop in which said internal flow channel of said workpiece support constitutes an evaporator of the refrigeration loop" and "maintaining an at least nearly uniform temperature of the coolant throughout said evaporator during the step of transferring heat from or to the coolant in said evaporator," without inventive or creative input from ATS.

286.   *The '859 Application.*  Claim 15 of the '859 application claims the combination of aspects of ATS's TDSF technology with previously existing semiconductor tool technology.  Glew Amended, ¶ 85, p. 24:18-20; Ex. 1250, p. 23.

287.   Claim 15 of the '859 application claims "circulating said thermal transfer medium in a loop comprising evaporator passages in said electrostatic

chuck, a compressor, a condenser and an expansion valve." Ex. 1250, p. 23.  This is the technology that ATS developed and disclosed to AMI.  Jacobi, ¶ 66.

288.   The additional limitations in Claim 15, and Claim 11 from which it depends, were all standard components of semiconductor tools at the time ATS proposed that AMI use the TDSF technology to control the temperature of AMI's semiconductor tools, and at the time ATS proposed that other companies in the semiconductor industry use the TDSF technology to control the temperature of their tools.  These additional limitations include: an electrostatic chuck and backside gas pressure control.  Glew Amended, ¶ 87, pp. 24:28-25:6.

289.   ATS made an inventive or creative contribution to Claim 15 and Claim 1, from which Claim 15 depends,  of the '859 application.

290.   AMI did not independently conceive of the element in Claim 15: "circulating said thermal transfer medium in a loop comprising evaporator passages in said e-chuck," without inventive or creative input from ATS.

291.   *Contribution through First Reduction to Practice.*  The DX-01 was the first chiller connected to an operating semiconductor tool that used an actual electrostatic chuck as an evaporator.   For example, Fovell testified that the DX-01 was initially tested by connecting it to an older generation Enabler electrostatic chuck.  Fovell, Nov. 19, 2010 (am), pp. 100:9-101:3.  Dr. Brillhart similarly testified that the DX-01 was first tested with an actual semiconductor etch tool in April or May of 2005.  Brillhart, ¶ 92.

292.    The testing of the DX-01 chiller on AMI's semiconductor etch tool in April or May of 2005 was the first reduction to practice of the inventions of the claims at issue in the ten AMI applications.

293.    AMI's expert Dr. France conceded that the DX-01 chiller was jointly developed. France, ¶ 141.

294.    Therefore, even according to AMI's witnesses, ATS made an inventive or creative contribution to the first reduction to practice of the inventions of the AMI patent claims at issue.

295.    Accordingly, pursuant to the JDA, ATS is a joint owner of each of the ten AMI applications.

IV.    <u>ATS's Claim for Breach of the JDA</u>.

296.  ATS contends that AMI breached the JDA by failing to consult with regard to its intent to file the ten patent applications.

297.  *Duty to Consult.*  Section 2 to Schedule 3 of the JDA provides that the "Parties will consult with each other regarding whether an application or applications for patent or other Intellectual Property rights should be filed, prosecuted, or maintained for any Jointly Developed IP." Ex. 1, p. 17, Sched. 3, § 2. The provision then lays out a series of scenarios for prosecuting an application for Jointly Developed IP.

298.  *Notice Requirement.*  Section 10.8 of the JDA provides a typical contract notice provision: "Any notice or other communication to be given hereunder shall be in writing and shall be delivered" in one of several specified manners. Ex. 1, p. 13, § 10.8.  One recipient was designated for each side.  Thayer was the designated recipient for ATS at all relevant times.  Id.

299.  No one at AMI ever contacted Thayer regarding AMI's intent to file patent applications on ATS's TDSF technology.  Thayer, ¶ 22.

300.  Thayer never received notice pursuant to Section 10.8 of the JDA regarding AMI's intent to file patent applications on ATS's TDSF technology. Thayer, Nov. 10, 2009, pp. 69:12-70:1.

301.  Section 10.8 covers more that just "notices," and extends to communications.  The consultation contemplated under Section 2 of Schedule 3 was a "communication," and thus is governed by Section 10.8.  The Court gives no weight to the fact that Section 2 of Schedule 3 does not reference Section 10.8.  The language "[a]ny notice or other communication" alleviates the need for further reference throughout the JDA.  Ex. 1, p. 13, § 10.8 (emphasis supplied).

302.  ATS's damage expert Michael Wagner ("Wagner") testified that it was reasonable for AMI to require the specific notice provision contained in Section 10.8.  Wagner, Nov. 17, 2009 (am), pp. 70:13-73:14.

303.  AMI's failure to give written notice of intent to file the ten applications was a breach of the JDA.

304.   Even if the Court concluded that something less than written notice was required to meet the obligation to confer, AMI's efforts were not reasonable and could not be deemed substantial compliance.

305.   No one at AMI ever consulted with Thayer or anyone else at ATS regarding the filing and prosecution of AMI's patent applications on ATS's TDSF technology as required by the JDA.  Thayer, ¶ 22.

306.   AMI's case for meeting its consulting obligation rests on the fact that Dr. Brillhart told Goyins that Dr. Brillhart intended to file at least one patent application relating to TDSF technology.  Goyins repeated this information in an e-mail and circulated it internally within ATS.  Ex. 79.  Goyins gave Dr. Brillhart a copy of that e-mail with Ken Cowans' office phone number written on the top of the e-mail and asked Dr. Brillhart to call Ken Cowans.  Ex. 29.  Dr. Brillhart never called Ken Cowans.  Brillhart, ¶¶ 100-101; Goyins, ¶¶ 29-39; Exs. 29, 44, 79; Thayer, Nov. 10, 2009, pp. 54:1-58:18; K. Cowans, Nov. 10, 2009, pp. 75:4-80:6, 121:8-124:2; Goyins, Nov. 12, 2009, pp. 83:12-89:21, 110:18-112:24; Brillhart, Nov. 18, 2009 (pm), p. 59:8-18.

307.   The e-mail on which AMI relies as evidence of notice or consultation under the JDA was not prepared or submitted by anyone from AMI.  It was an ATS internal communication that repeats what Dr. Brillhart told Goyins.  The e-mail clearly states that, "[i]f we are OK with the claims[,] then ATS needs to send Paul [Brillhart] an e-mail acknowledging we are comfortable."  Ex. 79.  No such acknowledging e-mail was ever sent from ATS to AMI.  Brillhart, ¶¶ 100-101; Goyins, ¶¶ 29-39; Thayer, Nov. 10, 2009, pp. 54:1-58:18; K. Cowans, Nov. 10,

2009, pp. 75:4-80:6, 121:8-124:2; Goyins, Nov. 12, 2009, pp. 83:12-89:21, 110:18-112:24; Brillhart, Nov. 18, 2009 (pm), p. 59:8-18; Wagner, Nov. 17, 2009 (am), pp. 70:13-73:14 (AMI's damages expert acknowledging that it was reasonable for AMI to require the specific notice provision contained in Section 10.8 of the JDA and that he had seen no evidence of compliance with the notice requirement).  Thayer never had any direct communication with Dr. Brillhart concerning his intent to file patent applications.  Thayer, Nov. 10, 2009, p. 121:18-22.

308.  Ken Cowans, one of the recipients of Goyin's e-mail, replied that **"[w]e cannot be 'comfortable' with any patent by AMAT about this subject without reading it in detail <u>before</u> putting a response in writing**."  Ex. 44 (bold and emphasis in original).  Goyins gave Dr. Brillhart a copy of his e-mail and requested that Dr. Brillhart call Ken Cowans.   Goyins, Nov. 12, 2009, pp. 111:5-112:21; Ex. 29.  He never did.

309.  Dr. Brillhart's conversation with Goyins and Goyins' circulation of his e-mail within ATS did not constitute consultation within the meaning of the JDA for a number of reasons.  First, the information which Goyins passed on was contained in a scant seven lines.  Ex. 79.  Real consultation would have included the number of applications and the full scope of the intended applications, if not drafts.  Second, Dr. Brillhart's conversation addressed none of the mechanics outlined in Section 2 of Schedule 3; for example, was this going to be considered "primarily related to Applied Equipment"?  Ex. 1, p. 17.

310.  AMI's contention that it was not a breach of the JDA to file the ten applications misses the point.  AMI PFFCL ¶¶ 757-59.  While literally true that no

provision of the JDA bars the filing of a patent application, the argument ignores the bigger point that it was a breach of contract to fail to consult prior to filing.

311.   *Damages.*  Thayer initially authorized expenditures in support of the TDSF SOW and the DX-01 project expecting that AMI would abide by the terms of the JDA, including that AMI would not file patent applications on any aspect of ATS's TDSF technology without consulting with ATS first.  Thayer, ¶ 23.

312.   Thayer first learned of the ten AMI patent applications in 2007.  <u>Id.</u>, ¶ 24.

313.   When Thayer did find out in 2007 that AMI had filed these applications without first consulting with ATS, and after Thayer was unable to get AMI to recognize ATS's interest in these applications, Thayer made sure that ATS stopped working on the DX-01 project.  <u>Id.</u>, ¶¶ 25-26.

314.   From May 2004, when the TDSF SOW was executed, through August 2007, when ATS ceased expending time, effort, and money in support of the DX-01 project, ATS incurred $905,300 ($1,094,297 after adding prejudgment interest) in damages in support of the DX-01 project.  Exs. 236, 618, 1500, 1502; Stolinski, ¶¶ 3-15; Tregillis, ¶¶ 6-21.

315.   The calculation of damages by ATS's damages expert, Christian Tregillis ("Tregillis"), included personnel costs associated with the DX-01, as well as facilities and overhead charges.  Tregillis, ¶¶ 6-21.

316.   Tregillis made a 10 percent reduction in his damage calculation to account for expenditure from which ATS would gain future benefit.  Id., ¶ 18.  The Court finds that this reduction is reasonable.  AMI's damages expert testified at trial that he had no opinion regarding the amount or percentage of benefit allegedly retained by ATS.  Wagner, Nov. 17, 2009 (am), p. 82:8-25.  AMI did not introduce any other evidence of the amount of ATS's allegedly retained benefit.  The Court finds that Tregillis's 10 percent  reduction is reasonable.

317.   The approach in measuring damages employed by ATS's expert, Tregillis, was very similar to the approach used by AMI's damages expert, Wagner.  Wagner did not criticize Tregillis' methodology.  Id., p. 67:10-21.

318.   Wagner testified that, assuming breach and causation, ATS's damages were at least $616,821.  Id., p. 77:8-13.

319.   According to Wagner, the difference between his calculation of damages and Tregillis' calculation of damages is related to Wagner's reduction of just over $400,000 (including interest) to account for Wagner's assumed failure to mitigate on ATS's part.  Id., p. 77:14-16.

320.   *Insufficient Basis to Mitigate.*  Based on all the evidence reviewed, the Court finds that ATS did not have  sufficient information prior to August 2007 regarding AMI's breach to require ATS to mitigate its damages; i.e., cease its funding of the project earlier.  This is based, at least in part, on the following:

a.     Wagner admitted that there was no communication from AMI to ATS that advised ATS that AMI was in breach of the JDA.  Id., p. 73:23-25.

b.     Wagner further admitted that AMI failed to advise ATS that AMI was filing the ten patent applications at issue in this case.  Id., pp. 69:4-70:1, 74:1-9.

c.     Wagner also conceded that the notice provision in the JDA, Section 10.8, was a reasonable notice provision and that he had seen no evidence of compliance with the notice provision by AMI.  Id., pp. 70:13-18, 73:1-4.

d.     Wagner acknowledged that, at least as of March 2007, AMI was saying to ATS: "we want you to continue with the DX-01 development."  Id., p. 74:10-19 (referring to Ex. 182 and testimony of Barsch).[11]

A reasonable and prudent person would not have perceived the need to terminate performance prior to 2007 when ATS learned on the AMI patent applications.

321.  *No "Double Recovery."*  The Court finds no basis for AMI's "double recovery" theory.  Wagner criticized Tregillis' damages calculation for allegedly failing to consider a "double recovery" in the event that the Court awarded ATS joint ownership of the ten AMI patent applications.  Wagner conceded, however, that his "double dip" argument was premised on the assumption that there was a

---

[11]However, Wagner would not agree that the March 2007 presentation to ATS was an "encouragement" to ATS to continue with the project.  Wagner, Nov. 17, 2009 (am), pp. 76:1-77:3.

causal link between the DX-01 development costs and the ten AMI patent applications.  Id., p. 103:4-7 (in response to questions from the Court).

322.   Moreover, Wagner testified that the costs associated with the DX-01 develop2ent that Tregillis analyzed in relation to ATS's damages calculation were not in any way linked to or related to the ten AMI patent applications.  Id., p. 102:9-19 (in response to questions form the Court).

323.  *Reduction.*  Even if ATS reasonably relied on AMI's duty to perform its disclosure and consultation obligations, it would have sustained a partial loss in any event.   ATS accelerated the depreciation of its research and development expenses incurred regarding the joint development project of the DX-01 with AMI in the middle of 2006.  Tregillis, Nov. 13, 2009, p. 170:19-24.

324.   ATS wrote off the $550,000 in research and development expenses related to the TDSF SOW in mid-2006 because, at that time, ATS believed such expenses were not recoverable because sales of the DX-01 were unlikely to occur.  Id., p. 174:15-24.

325.  Under a reliance theory, ATS's damages must be reduced by $550,000, resulting in recoverable damages of $355,300.  With prejudgment interest included the amount is $429,475.[12]

_____

[12]The Court has simply ratioed Tregilis's original calculation of damages versus damages including prejudgment interest in arriving at this figure.  See Findings of Fact, ¶ 314, supra.

V.     The Chiller Units Designated "DX-01" and "PX-7."

326.   AMI's Fifth Counterclaim seeks only joint ownership of the physical chiller units referred to by the parties as the "DX-01" and "PX-7."  PTCO, p. 13; Docket No. 676, p. 17.

327.   At the outset of trial, ATS made clear that it would not contest AMI's claim for joint ownership of the physical chiller units that the parties have been referring to as "DX-01."   ATS Opening Stmt. , Nov. 10, 2009, p. 10:1-6.  Thus, the Court need not make any findings whether AMI established its claim for joint ownership with regard to these physical DX-01 units.

328.   AMI submitted no evidence concerning the design and construction of any chiller unit bearing the designation "PX-7," and which was referred to as the "Samsung unit."  The only information presented by AMI regarding the Samsung unit was that it was based on ATS's TDSF technology.

329.   AMI submitted virtually no evidence concerning the design and construction of any chiller unit bearing the designation "PX-7," and which were referred to as the prober/handler units.

330.   Dr. France testified that all he knew about the prober/handler PX-7 is that it uses the TDSF technology and has two compressors, and understood that ATS designed the prober/handler PX-7, including the use of the dual compressors. France, Nov. 20, 2009 (am), pp. 22:24-23:11.

77

331.    AMI did not offer any evidence regarding any contributions by AMI to the PX-7 prober/handler units or the Samsung unit.

332.    AMI specifically did not offer any evidence regarding any contributions by AMI to any improvement, enhancement, or modification to the PX-7 prober/handler units or the Samsung unit, which would have been required to establish that these units included Developed IP under the JDA.  Ex. 1, p. 4, § 1.0.

333.    Accordingly, AMI did not establish by a preponderance of the evidence an ownership interest in any chiller bearing the designation "PX-7."

VI.    ATS's Affirmative Defenses.

334.    Because AMI did not establish its prima facie case on its breach-of-contract or ownership claims, ATS's affirmative defenses are moot.

335.    Accordingly, the Court need not make any findings pertaining to those defenses.

VII.    AMI's Affirmative Defenses.

336.    AMI asserts the following affirmative defenses to ATS's breach of contract claim: (1) unclean hands; (2) estoppel; (3) waiver; and (4) failure to mitigate.  PTCO, pp. 15-17, 23.

337. *Unclean Hands*.   ATS did not engage in any conduct which would support a defense of unclean hands.

338.   Although not required by the JDA, ATS informed AMI of its patent applications.  Christoffersen had discussions with Dr. Brillhart during which Dr. Brillhart knew that ATS was working on patents directed to the Transfer Direct System.  Christoffersen, Nov. 12, 2009, pp.  21:3-15; Ex. 3, p. 2, § 2.0; Ex. 18, p. 2; Christoffersen, ¶¶ 10-11.  As the SOW expressly provides, the project is to proceed "in accordance with [AMI's] Specification . . . and [ATS's] patented technology for TDSF."   Ex. 2, p. 2, § 2.0 (emphasis supplied).

339.   Christoffersen corresponded with Fovell and indicated to Fovell that ATS's Transfer Direct System was patented technology.  Ex. 1, p. 28; Ex. 289.

340.   After ATS filed the '059 provisional application on February 19, 2004 (AF-1), Christoffersen communicated with Dr. Brillhart that ATS's TDSF technology was ATS's patented technology: "ATSC desires to enter a joint development project to commercialize the ATSC patented technology" for exclusive use on AMI semiconductor equipment.  Ex. 55, p. 2.

341.   Christoffersen had discussed that ATS was filing patents on its TDSF technology with Dr. Brillhart during conversations leading up to the execution of the TDSF SOW.  Christoffersen, ¶ 27.

342.   There were also at least four revisions to the TDSF SOW, which were reviewed by Dr. Brillhart and AMI's legal counsel, all of which referred to the

TDSF technology as ATS's patented technology.  Ex. 246, p. 3, § 2.0; Ex. 24, p. 3, § 2.0; Brillhart, Nov. 18, 2009 (am), pp. 75:20-76:19.

343.   Dr. Brillhart never asked ATS what patents ATS was referring to. Brillhart, Nov. 17, 2009 (am), p. 77:7-11.

344.   On May 4, 2004, AMI and ATS executed the TDSF SOW that expressly referred to ATS's patented technology for TDSF.  Ex. 3, p. 2, § 2.0; p. 4, § 11.3.

345.   AMI's Rule 30(b)(6) witness, Larisch, testified that AMI did not care whether ATS had "patented technology for TDSF" as set forth in the TDSF SOW. Larisch Depo., pp. 169:7-10, 169:14-170:5, 170:9-16.

346.   Larisch also testified that he was not aware of anyone from AMI asking anyone at ATS for copies of the patents or patent applications on TDSF prior to the SOW.  Id., pp. 176:21-177:3.

347.   Dr. Brillhart testified that he was aware in 2003 or 2004 that ATS was filing patent applications relating to the technology contained in ATS's November 2002 presentation.  Brillhart, Nov. 18, 2009 (am), pp. 37:11-39:4.

348.   Dr. Brillhart also testified that he was aware, in 2005, that ATS had patented, or was planning to patent, ATS's TDSF technology.  Id., pp. 39:12-40:3.

349.    Thus, the Court finds that ATS did not conceal from AMI that ATS was filing patents on ATS's TDSF technology.

350.    Moreover, Dr. Brillhart decided to file the AMI applications relating to direct expansion only after learning that ATS had filed patent applications on the TDSF technology.  Id., pp. 40:19-23, 57:22-58:12.

351.    Dr. Brillhart knew when the parties' JDA expired.  Brillhart, ¶ 107.

352.    Dr. Brillhart submitted his Invention Alert form to his patent attorneys the first business day after the JDA expired.  Brillhart, Nov. 18, 2009 (am), pp. 44:4-45:17.

353.    Thus, far from being unaware of ATS's TDSF patent filings, it appears that AMI's knowledge of ATS's TDSF patent filings spurred AMI to file the ten AMI patent applications at issue.

354.    *Absence of Misrepresentations.*  Goyins never told Dr. Brillhart that the list of patents and applications that is the purported second page of Exhibit 70 was related in any way to the non-disclosure agreement ("NDA") addendum that is the first page of Ex. 70.  Goyins Rebuttal, ¶ 49.

355.    Goyins did not make any representations about the scope or content of ATS's patents or patent applications to Dr. Brillhart, and specifically did not make any representations that ATS's Pre-Existing IP relating to the TDSF technology was

limited to the list of patents and applications that is the purported second page of Exhibit 70.  Goyins Rebuttal, ¶¶ 48-49.

356.   There is nothing on what was identified as the first page of Exhibit 70 that refers to a list of patents and nothing on what was identified as the second page of Exhibit 70 that refers to an NDA or an addendum to an NDA.  Ex. 70, p. 1.

357.   Goyins had a practice of numbering the pages of multiple-page documents and nothing on the first or second page of Exhibit 70 reflects Goyins' practice of numbering multiple-page documents.  Ex. 70; Goyins, Nov. 12, 2009, p. 109:10-17.

358.   Thus, the Court finds that ATS did not make any misrepresentations to AMI regarding ATS's patent filings on the TDSF technology.

359.   In any event, the Court finds that the dispute over whether the second page of Exhibit 70 was attached to the first page is an unhelpful distraction.  It is abundantly clear that AMI knew at all times during the relationship that TDSF was AMI's patented technology.  See Findings of Fact, ¶¶ 338-353, supra.  ATS consistently identified the TDSF technology as ATS's propriety technology and AMI never objected.

360.   *Estoppel*.  There is no basis for estopping ATS from asserting its breach of contract claim for failure to consult against AMI.

361.  There was no basis for Dr. Brillhart to proceed with the ATS patent applications under the belief that ATS consented.  First, ATS never gave written or verbal consent.  Second, ATS's silence could not reasonably be deemed consent in view of (a) AMI's affirmative duty to consult, and (b) Goyins' request that Dr. Brillhart contact Ken Cowans.

362.  ATS engaged in no conduct which would affirmatively or by implication support an estoppel.

363.  On or shortly before April 22, 2005, Dr. Brillhart informed Goyins that Dr. Brillhart was contemplating filing some patents that referred to the TDSF technology.  Goyins, ¶ 29.

364.  On April 22, 2005, Goyins sent an internal e-mail to Christoffersen, Ken Cowans, Antoniou and copying Thayer, conveying that Dr. Brillhart had identified three general concepts on which he was contemplating filing a patent and wanted to know if there were any conflicts with any of ATS's patent filings and if ATS was comfortable with AMI filing a patent on these three ideas.  Goyins, ¶¶ 30-32; Ex. 79.

365.  Goyins' e-mail concluded with the sentence: "If we [ATS] are OK with the claims then ATS[] needs to send Paul [Brillhart] an e-mail acknowledging we are comfortable."  Ex. 79.

366.  On April 22, 2005, Cowans sent a responsive e-mail stating that he required more information in order to be able to respond to Dr. Brillhart's inquiry

and, in particular, that ATS needed to see the actual claims that AMI was planning to file before ATS would be able to respond.  Goyins, ¶ 35; Ex. 44.

367.    After receiving Ken Cowans' instructions that he needed more information, Goyins printed out his original e-mail.  Goyins, ¶ 36; Ex. 29.  He wrote at the top of the e-mail that it was "for Paul B" and wrote Ken Cowans' phone number.  Goyins, ¶ 36; Ex. 29.

368.    Goyins then handed the e-mail to Dr. Brillhart and told him that he needed to call Ken Cowans so that they could work out any issue pertaining to the patent filings.  Goyins, ¶ 36.  The printed e-mail concluded with the sentence: "If we [ATS] are OK with the claims then ATS[] needs to send Paul [Brillhart] an e-mail acknowledging we are comfortable."  Ex. 29.

369.    Goyins anticipated that Dr. Brillhart would call Cowans in response to Goyins' request.  Goyins, Nov. 12, 2009, p. 112:20-24.

370.    There is no evidence that anyone at ATS ever sent Dr. Brillhart an e-mail acknowledging that ATS was comfortable with, or otherwise acquiesced in, the filing of the patent applications.

371.    Nobody at AMI ever contacted Goyins regarding the AMI patent applications.  Goyins, ¶ 38.

372.   Dr. Brillhart never contacted Ken Cowans regarding the patent applications.  Brillhart, Nov. 18, 2009 (pm), p. 59:8-18; K. Cowans, Nov. 10, 2009, p. 121:18-22.

373.   Dr. Brillhart did not inform ATS that AMI would be filing ten patent applications.  Brillhart, Nov. 10, 2009 (am), p. 54:21-23.

374.   AMI did not provide ATS with notification under Section 10.8 of the JDA prior to filing the ten AMI patent applications.

375.   Dr. Brillhart never provided ATS with sufficient information for ATS to determine whether Dr. Brillhart's proposed patent applications would claim ATS's Pre-Existing IP or Jointly Developed IP.  K. Cowans, Nov. 10. 2009, pp. 121:23-123:13.

376.   ATS had no reason to think that AMI would file patent applications that related to any aspect of the TDSF technology without consultation.

377.   Despite working with ATS after the expiration of the JDA on May 14, 2005, Dr. Brillhart never told anyone at ATS about Dr. Brillhart's Invention Alert Forms prepared on Monday, May 16, 2005 or the subsequent filing of the ten AMI applications.  Brillhart, Nov. 18, 2009 (am), p. 55:10-14.

378.  Contrary to its contention, AMI was not forced to proceed with its patent applications without knowledge of ATS's objections.  AMI PFFCL, ¶ 892.  In fact, Dr. Brillhart was asked to contact Ken Cowans (Ex. 29), but never did.

379.  *Waiver.*   The same factual consideration which bar the application of an estoppel also bar a finding that ATS waived its rights with regard to AMI's breach of its duty to consult.

380.  Nothing in ATS's conduct amounted to a knowing and willing relinquishment of its contractual rights.

381.  The waiver provision of the JDA is sufficient to bar AMI's assertion of a waiver.  Section 10.9 of the JDA specifically excludes conduct as a basis for a waiver, and requires that any "waiver [be] in writing and signed by an officer of such Party and then only to the extent specifically set for in such writing."  Ex. 1, p. 17.  There is no writing of any type signed by ATS.

382.  *Mitigation.*  To the extent AMI bases any failure to mitigate on the basis of ATS's failure to act on Dr. Brillhart's oral advice to Goyins, the Court rejects the argument.  ATS was not on notice and not required to takes steps in mitigation until August 2007 when it learned through its own monitoring activities that AMI had filed the ten patent applications.

383.   Accordingly, AMI has failed to establish by a preponderance of the evidence any of its affirmative defenses.

## CONCLUSIONS OF LAW

The Court first addresses the legal issues which surround the JDA, and then addresses the parties' claims and affirmative defenses, most of which depend on the JDA.

I.   Interpreting the JDA.

1.   California law governs the JDA.  Ex. 1, p. 12, § 10.4

2.   The provisions at issue which define and allocate intellectual property rights are clear and explicit, and they should be given their plain meaning. American Alternative Ins. Corp. v. Superior Court, 135 Cal. App. 4th 1239, 1245 (2006) ("We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage.").

3.   The JDA is complete and contains the entire understanding between ATS and AMI.  Hellman, Nov. 13, 2009, pp. 232:16-25, 238:22-239:14; Ex. 1, p. 14, § 10.14.

4.   *Definitions.*  The JDA specified four separate categories of intellectual property based on which party developed the intellectual property: (1) each party's "Pre-Existing IP," (2) "[AMI] Developed IP," (3) "[ATS] Developed IP," and (4) "Jointly Developed IP."  Ex. 1, pp. 5-6, §§ 4.1, 4.2-4.5; Docket No. 558, p. 2.

5.   Developed IP was defined as:

> Any and all improvements, enhancements or modifications made to a
> Component or Applied Equipment, and any invention, discoveries,
> works of authorship, know-how, technical information, work product
> and/or other technology (whether or not patentable or subject to other
> statutory protection), and all Intellectual Property rights embodied in
> any of the foregoing, that are created, conceived or first reduced to
> practice during the course of this Agreement.

Ex. 1, p. 4, § 1.0 (Definitions).

6.      As the text makes plain, Developed IP encompasses two distinct forms
of property, tangible property and intangible Intellectual Property, as follows:

> Any and all improvements, enhancements or modifications made to a
> Component or AMI Equipment . . . and all Intellectual Property rights
> embodied in any of the foregoing, that are created, conceived or first reduced
> to practice during the course of this Agreement.

Id.

7.      The first type of Developed IP is tangible Developed IP, namely
"improvements, enhancements, or modifications" to ATS Components or AMI
Equipment. Id.

8.      The second type of Developed IP is intangible Developed IP, which includes Intellectual Property rights – a term defined by the JDA as including patent rights and all patent applications, among other legal rights.  Id.

9.      The JDA specifically states that Intellectual Property rights may be "embodied in" tangible improvements, enhancements, or modifications to Components or Equipment, further confirming the separate nature of the tangible Developed IP and intangible Developed IP.  Id.

10.     Jointly Developed IP was defined as:

> All Developed IP created, conceived, or first reduced to practice jointly by Supplier and Applied or employees of each during the course of and directly as a result of the performance of the Project or activities under this Agreement, and wherein each Party has made an inventive or creative contribution thereto through the combined efforts of employees of each Party collaborating together.

Id.

11.     The Pre-Existing IP and independently Developed IP of each party remains the sole property of that party.  Id., pp. 5-6, §§ 4.1, 4.3-4.4.

12.     The parties share joint ownership of any Jointly Developed IP.  Id., p. 6, §§ 4.5.

13.     The JDA defines "Component" as "[a]ny item manufactured and sold by Supplier [ATS]."  Id., p. 4, § 1.0 (Definitions).

14.     The JDA defines "Applied Equipment" as "Applied's equipment and processes."  Id., p. 3, § 1.0 (Definitions).

15.     The JDA defines the term "Intellectual Property" as including all types of intangible intellectual property rights, including "[a]ll patent rights" and "all applications and registrations therefor."  Id., p. 4, § 1.0 (Definitions).

16.     The JDA does not specifically define the term "IP," but instead defines various types of "IP."  For example, the JDA defines Pre-Existing IP as "[e]ach Party's Intellectual Property rights in existence as of the execution date of the applicable SOW."   Id.

17.     A party's Pre-Existing IP is limited to "Intellectual Property rights" in existence as of the date of the applicable [Statement of Work]."   Id.

18.     The JDA defines three categories of Developed IP based on who created the Developed IP: AMI Developed IP, ATS Developed IP, and Jointly Developed IP.  Id., pp. 5-6, §§ 4.2-4.4.

19.     The JDA defines various ownership rights in each category of IP.  Id., pp. 5-6, §§ 4.1, 4.3, 4.4, 4.5.

20.     Section 4.2 of the JDA  provides that, in general, "[e]ach Party's rights and obligations with respect to any and all Developed IP shall be set forth in the applicable Schedule 1, 2, 3, or 4 attached to this Agreement."   Id., p. 5, § 4.2.

21.     Section 4.5 of the JDA provides that both ATS and AMI shall jointly own Jointly Developed IP, with each party having an equal and undivided one-half interest therein. Id., p. 6, § 4.5.

22.     *Survival of Rights.*  The intellectual property provisions of Section 4.0 of the JDA survived expiration of the JDA. Id., p. 10, § 8.0.

23.     The surviving intellectual property provisions include the consultation provision of Schedule 3, Section 2 of the JDA. Id.; id., p. 5, § 4.2.

24.     AMI's filing of its patent applications after May 14, 2005 has no effect on the scope of intellectual property rights which survived the expiration of the JDA.

25.     *Scope of Section 4.8.*  AMI relies on Section 4.8 of the JDA to claim sole ownership of all ten AMI patent applications, arguing that the applications claim an "improvement, enhancement, change, or modification" to AMI Equipment. PTCO at 22.

26.     Section 4.8 provides a limited exception to the allocation of rights described in Sections 4.2 through 4.5 for a very narrow category of Developed IP (tangible property rights) based on improvements to AMI's equipment and

processes. Specifically, Section 4.8 states that, "notwithstanding any other provisions in this Agreement or any attachments hereto," AMI shall have sole ownership and control over "any improvement, enhancement, change, or modification to any [AMI] Equipment." Ex. 1, p. 6, § 4.8.

27.     Section 4.8 is limited to AMI's tangible "equipment and processes," such as AMI's electrostatic chucks. Id.

28.     Section 4.8 tracks the language in the definition of Developed IP that distinguishes between tangible "improvements, enhancements, or modifications" to physical equipment and intangible Intellectual Property rights. Id., p. 4, § 1.0 (Definitions).

29.     Section 4.8 applies only to physical improvements, enhancements, changes, or modifications to AMI's equipment or processes, and does not apply to Intellectual Property rights "embodied in" such equipment or processes. Id., p. 6, § 4.8. Such rights are governed by other provisions of the JDA. Id., pp. 5-6, §§ 4.1-4-5.

30.     Section 4.8 provides AMI with sole ownership and control over a physical item that constitutes an improvement, enhancement, change, or modification to AMI's equipment or processes, but does not determine the ownership of the Intellectual Property rights in such improvements, enhancements, changes, or modifications. Id., p. 6, § 4.8.

31.     Section 4.8 does not determine the parties' respective rights in the AMI patent applications, even if those applications claim improvements, enhancements, changes, or modifications to AMI Equipment, because Section 4.8 "says nothing of intellectual property rights in general, or patents in particular."  Docket No. 589, p. 8.

32.     *Schedule 3, Section 2.*  Schedule 3, Section 2, rather than Section 4.8, addresses, determines, and controls intangible Intellectual Property rights in Jointly Developed IP.  Ex. 1, p. 17, Sched. 3, § 2.

33.      Schedule 3, Section 2 specifically addresses the situation where a patent application is sought to secure Intellectual Property rights on Jointly Developed IP that is primarily related to AMI Equipment.  Id.

34.     Section 2 provides that, if the Jointly Developed IP is primarily related to AMI Equipment, then AMI has the option to control the process of preparing, filing, prosecuting, and/or maintaining the application(s).  Id.

35.     Likewise, ATS has the option to control the process of preparing, filing, prosecuting and/or maintaining patent applications if the Jointly Developed IP is primarily related to ATS's Components.  Id.

36.     Even if Section 4.8 could apply to intellectual property rights, the claims in the AMI patent applications for which ATS seeks joint ownership do not claim "improvements, enhancements, changes, or modifications" to AMI Equipment.

37.     Connecting an ATS Component (a chiller) to AMI Equipment (an etch tool/electrostatic chuck) does not constitute an improvement, enhancement, change, or modification to the AMI Equipment.  Hellman, Nov. 13, 2009, pp. 246:20-247:15.

38.     Attaching a Component to AMI Equipment does not result in AMI owning all intellectual property rights relating to the Component.  Barsch, Nov. 17, 2009 (am), pp. 52:18-53:3.

39.     Accordingly, merely combining a TDSF-based chiller to AMI's conventional semiconductor tools does not make the chiller part of an "improvement, enhancement, change, or modification" to AMI Equipment.  Thus, even under AMI's view of Section 4.8, AMI does not gain sole ownership over intellectual property rights pertaining to a combination of a TDSF-based chiller with any AMI Equipment.

40.     The "primary reason" that AMI was pursuing the direct expansion technology was because it allowed AMI to use its existing tools in higher power applications that required increased cooling capacity.  Buchberger, Nov. 12, 2009, p. 187:1-18.

41.     Specifically, the benefit of the DX-01 chiller was that it provided increased cooling capacity without any need to change the mechanical design of AMI's chucks.   Buchberger, Nov. 12, 2009, pp. 187:19-188:10.

42.     The AMI Equipment, i.e., the chuck design, the cathode design, the chamber body, and any of the parts that make up the chamber, did not have to be changed to use the DX-01.  Buchberger, Nov. 12, 2009, p. 188:2-10.

43.     As discussed in more detail below, at least one claim in each of the AMI patent applications does not primarily relate to any "improvement, enhancement, change, or modification" to AMI Equipment.

44.     *Section 10.8.*  Section 10.8 requires that, "[a]ny notice or other communication to be given hereunder shall be in writing and shall be delivered (as elected by the Party giving such notice): (i) personally; (ii) by postage prepaid registered or certified airmail, return receipt requested; (iii) by express courier; or (iv) by telecopy with a confirmation copy deposited prepaid with an internationally recognized express courier service."  Ex. 1, p. 13, § 10.8 (emphasis supplied).

45.     The JDA required written notice to the individuals specified in Section 10.8 to avoid confusion over whether proper notice was given.  Hellman, Nov. 13, 2009, pp. 240:18-242:4; Ex. 1, p. 13, § 10.8.

46.     Section 10.8 requires any notice by AMI be provided in writing to Thayer at his business address.  Ex. 1, p. 13, § 10.8.

47.     Schedule 3, Section 2 entitled "Acquisition of Intellectual Property Rights" imposes several obligations on the parties, including a duty to consult with the other party before applying for Intellectual Property rights on Jointly Developed IP.  Section 2 requires that, "[t]he Parties will consult with each other regarding

whether an application or applications for patent or other Intellectual Property rights should be filed, prosecuted or maintained for any Jointly Developed IP." Id., p. 17, Sched. 3, § 2.

48.     Section 2 also addresses the parties' Intellectual Property rights and obligations with respect to ATS Developed IP and AMI Developed IP. Id.

49.     The term "consult," as used in the JDA, has its ordinary dictionary meaning. Hellman, Nov. 13, 2009, p. 237:13-20.

50.     The ordinary meaning of the duty to consult in Schedule 3, Section 2 required AMI to have discussions or confer with ATS to seek advice or instructions, before undertaking a course of action. See California Native Plant Society v. City of Rancho Cordova, 172 Cal. App. 4th 603, 639 (2009).

51.     Schedule 3, Section 2 is complete and contains the entire understanding between ATS and AMI regarding the acquisition of intellectual property rights. Hellman, Nov. 13, 2009, pp. 236:17-237:25.

52.     Regardless of whether a patent application claims inventions primarily related to AMI's Equipment or ATS's Components, "[e]ach Party shall execute any and all documents necessary to effectuate each Party's equal and undivided one-half (1/2) interests in the Jointly Developed IP and Intellectual Property rights with respect thereto." Ex. 1, p. 17, Sched. 3, § 2.

53.     A party only loses its one-half interest in a patent application claiming Jointly Developed IP by declining to participate in the preparation, filing, prosecution, and/or maintenance of an application by contributing half of the costs, or by commencing and then abandoning the prosecution of an application or maintenance of an issued patent.  Id.

54.     With regard to Jointly Developed IP, the consultation provision requires the parties to consult with each other and cooperate in the process of determining whether to file, prosecute, and maintain patent applications for any Jointly Developed IP.  Id.

55.     Section 2 requires more than simply "informing" the other party of an intent to file patent applications on Jointly Developed IP.  The consultation must be sufficient to allow the non-filing party to make an informed "election" as to whether to participate in the process and, if it so chooses, to actually participate in the process.  Id.

56.     The duty to consult is a separate obligation that must be satisfied before, and as a necessary part of, determining which party may control the process of preparing, filing, prosecuting, and/or maintaining a patent application based on whether it is primarily related to AMI Equipment or an ATS Component.  Id.

57.     Section 2 provides that one party may elect not to participate in the preparation, filing, prosecution, and/or maintenance of patent applications, and in that event, the other party may assume sole control over the process.  Id.

58.    Section 2 further provides that a party who commences prosecution, but then abandons such prosecution, must notify the other party to allow further prosecution.   Id.

59.    Section 2 provides ATS with the exclusive right to continue prosecution and maintenance of any claimed subject matter abandoned by AMI that is Jointly Developed IP, and all of the ownership rights in such claims.   Id.

60.    ATS had an equal and undivided one-half interest in the AMI patent applications at the time they were filed because those applications claimed Jointly Developed IP.   Ex. 1, p. 6, § 4.5.   Under Section 2, ATS has the exclusive right to continue to prosecute any abandoned claims directed to Jointly Developed IP.   Ex. 1, p. 17, Sched. 3, § 2.

61.   *Section 9.3.*   The JDA contains a limitation of damages provision which reads in part:

"**IN NO EVENT SHALL EITHER PARTY HERETO BE LIABLE TO THE OTHER PARTY HERETO FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR CONTINGENT DAMAGES, WHETHER OR NOT APPLIED [AMI] OR SUPPLIER [ATS] HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**"

Ex, 1, p. 11, § 9.3 (capitalization and boldface per original).

II.    Declaration of Ownership in the '835 Patent.

98

62.     The JDA states that "[e]ach Party's Pre-Existing IP shall remain such Party's sole property."  Ex. 1, p. 5, § 4.1.

63.     "[I]f ATS created, conceived and reduced to practice all the claims in a patent prior to AMI's involvement, AMI could not gain joint ownership of that patent by contributing to the reduction to practice of a later embodiment of that patent."  Docket No. 558, p. 9.  This would run counter to Section 4.1.  Id.

64.     Because the Court previously granted summary judgment of ownership on all but Claims 3 and 4 of the '835 Patent, the only issue for trial with respect to ownership of ATS's '835 Patent was whether AMI made an "inventive or creative contribution" to maintaining a two-phase flow throughout the entirety of the thermal load.  Docket No. 678, p. 1.

65.     ATS conceived of the use of two-phase refrigerant flow throughout the thermal load, which is the subject matter of Claims 3 (during the cooling mode) and 4, at least as early as January 2001.

66.     ATS first reduced to practice the two-phase flow concept at least as early as March 2001.  A reduction to practice of a method occurs when the inventors (1) perform a process that meets all the limitations of the claim, and (2) determine that the invention would work for its intended purpose.  Taskett v. Dentlinger, 344 F.3d 1337, 1340 (Fed. Cir. 2003).  Testing of the invention may be necessary to determine whether it would work for its intended purpose, but "the test need not occur under conditions of actual, commercial use."  Id. at 1341.

67.    Because ATS created, conceived, and reduced to practice the inventions of Claims 3 and 4 of the '835 Patent before any involvement by AMI, those inventions are ATS's Pre-Existing IP.

68.    Based on the undisputed evidence that ATS conceived the idea of maintaining a two-phase refrigerant throughout the thermal load in January 2001 (see Ex. 163), and reduced this idea to practice during testing of its 2001 Prototype, AMI made necessarily made no contribution to the inventions of Claims 3 or 4 of ATS's '835 Patent.

69.    In contrast to ATS's evidence, AMI presented no evidence that it made an inventive or creative contribution to the creation, conception, or first reduction to practice of the two-phase flow concept.

70.    AMI's earliest alleged conception of the two-phase flow concept is not until 2003, more than two years after ATS created, conceived, and first reduced two-phase flow to practice, and nearly a year after ATS disclosed the concept to several AMI employees.

71.    AMI could not gain joint ownership of the '835 Patent by contributing to the reduction to practice of a later embodiment of those claims.  Docket No. 558, p. 9.

72.    At trial, AMI argued that it contributed to Claims 3 and 4 of the '835 Patent by conceiving of the "mist flow" concept.  France, ¶ 184.  AMI relied on calculations in Fovell's lab notebook.  Id.

73.     However, the term "mist" does not appear in either Claims 3 or 4.  The term "mist" only appears in Claim 1, from which Claims 3 and 4 depend.  The Court already determined on summary judgment that AMI failed to present any evidence that AMI made any relevant contribution to the subject matter of Claim 1, which necessarily included the "mist" limitation.  Docket No. 558 (granting summary judgment of ownership on all but Claims 3 and 4 of the '835 Patent); Docket No. 678, p. 2 (clarifying that Docket No. 558 granted summary adjudication on all but Claims 3 and 4 of the '835 Patent).

74.     Moreover, as this Court previously found, ATS's February 19, 2004 provisional application "clearly refers to the concept of 'vapor and liquid mist'." Docket No. 352, p. 10.  Therefore, the mist flow concept was created, conceived, and constructively reduced to practice by ATS no later than February 19, 2004.

75.     Accordingly, even if  Fovell's calculations in December 2004 did relate to the mist flow concept, those calculations would be irrelevant to whether AMI made an "inventive or creative contribution" to the creation, conception, or first reduction to practice of that concept.  Id. ("the Court attributes very little probative value to the fact that Fovell was conducting quality ratio calculations well after the date of the provisional application."); Docket  No. 554, p. 9 ("calculations of quality ratios after the date of this application [February 19, 2004] have little probative value with respect to inventorship.")

76.     Dr. France's contention that AMI made an "inventive or creative contribution" to Claims 3 and 4 of the '835 Patent by conceiving of the idea of maintaining the refrigerant as a two-phase flow throughout the thermal load "at all

times" is also rejected.  AMI did not conceive of this idea.  Brillhart, Nov. 17, 2009 (pm), pp. 44:23-45:21 (testifying that it is "physically impossible to have two-phase flow at all times"); 46:3-48:8 (explaining that two-phase flow will not exist at all times and that whether two-phase flow exists depends on the operating parameters of the system); Ex. 5, pp. 1-2.

77.    On August 3, 2009, the Court issued its <u>Markman</u> constructions. Docket No. 351.  The Court did not construe Claims 3 and 4 of the '835 Patent as requiring that the refrigerant be maintained as a two-phase flow throughout the tool "at all times."   AMI did not propose such a construction.  Accordingly, even if AMI did conceive of maintaining a two-phase refrigerant throughout the thermal load at all times, this concept is not claimed in Claims 3 or 4 of the '835 Patent. Thus, AMI could not obtain joint ownership on the basis of such a contribution.

78.    Moreover, as Dr. France conceded at trial, Claims 3 and 4 apply to both heating and cooling the thermal load, and Claim 3 does not require maintaining a two-phase flow throughout the thermal load.  France, Nov. 20, 2009, 8:22-9:15.

79.    The Court's claim construction Order held that neither Claim 3 nor Claim 4 of the '835 Patent require using a 70-30 vapor-liquid mixture at the inlet of the tool.  Docket No 351, p. 10; Ex. 87, col. 13, ll. 16-24.

80.    Accordingly, evidence relating to AMI's alleged contributions to (a) maintaining the refrigerant "in the mist flow regime" throughout the thermal load, (b) maintaining the refrigerant as a two-phase refrigerant "at all times," or

(c) using a 70-30 vapor-liquid mixture at the inlet of the tool, are irrelevant to the creation, conception, or first reduction to practice of Claims 3 or 4.

81.    Claims 3 and 4 of the '835 Patent claim only ATS's Pre-Existing IP.

82.    AMI made no inventive or creative contribution to ATS's creation, conception, or first reduction to practice of the technology in Claims 3 and 4 of the '835 Patent.

83.    As Pre-Existing IP under the JDA, ATS is the sole owner of the '835 Patent and the subject matter claimed therein.

84.    Thus, this Court rejects AMI's claim for joint ownership of the '835 Patent.

85.  ATS is entitled to a declaration that it is the exclusive owner of the '835 Patent, including specifically Claims 3 and 4.

III.    Declaration of Ownership Regarding AMI's Ten Patent Applications.

86.    ATS relies on 28 U.S.C. § 2201 for the Court's declaratory judgment jurisdiction.

87.    Under the Declaratory Judgment Act, courts look to whether there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (citation omitted) (interpreting 28 U.S.C.. § 220).  The parties' dispute with regard to ATS's rights in the AMI patent applications meet this standard.

88.    Disputes as to rights or obligations of parties with respect to activities that have been discontinued are moot.  Murphy v. Hunt, 455 U.S. 478, 481-82 (1982) (per curiam); Headwaters, Inc. v. Bureau of Land Management., Medford Dist., 893 F.2d 1012, 1015 (9th Cir. 1990); Sample v. Johnson, 771 F.2d 1335, 1338 (9th Cir. 1985), cert. denied, 475 U.S. 1019 (1986); Lindquist v. Idaho State Bd. of Corrections, 776 F.2d 851, 853-54 (9th Cir. 1985).  However, this principle is not applicable here because Schedule 3, Section 2 affords the other party certain rights where a patent application is withdrawn or abandoned.  Ex. 1, p. 17, Sched. 3, § 2.  Even where the Patent Office has rejected a claim, that does not necessarily moot ATS's right to participate in the process, including the selection of prosecution strategy, which may include challenging such a decision.

89.    The JDA grants joint ownership where a party makes an inventive or creative contribution to the creation, conception, or first reduction to practice of Developed IP.  Ex. 1, pp. 2, 6, §§ 1.0 (Definitions), 4.5; Docket No. 558, p. 9.

90.    ATS need only prove its inventive or creative contributions by a preponderance of the evidence.  Docket No. 558, p.  9.

91.    This Court previously defined the term "inventive" to refer to the sort of contribution that would support a claim of inventorship under U.S. Patent Law. Id., p. 7.

92.     This Court previously found that, as used in the JDA, the term "creative contribution" refers to a much broader range of activities that includes anything "originative," and need not be "useful or nonobvious, as defined under patent law." Id., p. 8. "[U]nder the JDA a mere 'creative' contribution to patentable subject matter would render it Jointly Developed IP." Id.

93.     This Court found that the JDA "does not contemplate a claim-by-claim division of patent rights." Docket No. 589, p. 6 n.2. "The JDA is clear that ownership of intellectual property rights is divided on a patent-by-patent basis." Id.

94.     "[F]or joint ownership, ATS need only prove that it made an 'inventive or creative' contribution to any of the claims in the AMI Patent Applications." Id., p. 5.

95.     Therefore, ATS need only show an "inventive or creative contribution" to a single claim in an AMI patent application, as filed, to establish a joint ownership interest in that application. Id., p. 6 n.2.

96.     Neither party requested that this Court construe any term or limitation in any claim at issue in the AMI patent applications. Accordingly, the Court has adopted the plain and ordinary meaning of the terms in the claims of the AMI patent applications.

97.     ATS created and conceived of the use of a semiconductor tool, specifically including an electrostatic chuck, as an evaporator in a refrigeration cycle in 2000 and 2001.

98.     At least one claim in each of the AMI patent applications, as filed and published, claims the use of an electrostatic chuck as an evaporator in a refrigeration cycle.  Accordingly, as filed and published, at least one claim in each of the ten AMI patent applications claims the combination of aspects of ATS's TDSF technology that ATS had proposed to AMI with features of semiconductor tools that were well known at the time that ATS proposed using its TDSF technology with those tools.  Glew Amended, ¶¶ 11, 45.

99.     Because at least one claim in each of the ten AMI patent applications, as filed and published, claims the combination of aspects of ATS's TDSF technology with semiconductor tools that were well known at the time ATS proposed its TDSF technology for use with those tools, ATS formulated the idea of the claimed combinations and proposed to AMI the subject matter claimed in those claims.  Id., ¶ 12.

100.   ATS made an inventive or creative contribution under the JDA to the creation, conception, and/or first reduction to practice of the subject matter of at least one claim in each of the AMI patent applications as filed and published.

101.   For the reasons discussed above, the fact that each of the claims to which ATS made a creative contribution may have involved AMI an improvement, enhancement, change, or modification to AMI Equipment does not afford AMI exclusive rights to such claims, in contrast to the physical embodiments of such advances.

102.    *'559 Application.*  ATS made an inventive contribution to the reactor of Claims 1 and 8 of the '559 application.  <u>Id.</u>, ¶ 63.

103.    ATS made a creative contribution to the reactor of Claims 1 and 8 of the '559 application.  <u>Id.</u>

104.    Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '559 application.

105.    *'558 Application.*  ATS made an inventive contribution to the reactor of Claims 2 and 11 of the '558 application.  <u>Id.</u>, ¶ 68.

106.    ATS made a creative contribution to the reactor of Claims 2 and 11 of the '558 application.  <u>Id.</u>

107.    Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '558 application.

108.    *'567 Application.*  ATS made an inventive contribution to the reactor of Claims 1 and 8 of the '567 application.  <u>Id.</u>, ¶ 72.

109.    ATS made a creative contribution to the reactor of Claims 1 and 8 of the '567 application.  <u>Id.</u>

110.    Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '567 application.

111.   *'183 Application.*   ATS made an inventive contribution to the reactor of Claims 1 and 8 of the '183 application. <u>Id.</u>, ¶ 55.

112.   ATS made a creative contribution to the reactor of Claims 1 and 8 of the '183 application. <u>Id.</u>

113.   Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '183 application.

114.   *'184 Application.*   ATS made an inventive contribution to the method of Claim 1 of the '184 application.   <u>Id.</u>, ¶ 59.

115.   ATS made a creative contribution to the method of Claim 1 of the '184 application. <u>Id.</u>

116.   Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '184 application.

117.   *'326 Application.*   ATS made an inventive contribution to the methods of Claims 1 and 8 of the '326 application. <u>Id.</u>, ¶ 76.

118.   ATS made a creative contribution to the methods of Claims 1 and 8 of the '326 application. <u>Id.</u>

119.   Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '326 application.

120.   *'292 Application.*  ATS made an inventive contribution to the reactor of Claim 1 of the '292 application.  Id., ¶ 51.

121.   ATS made a creative contribution to the reactor of Claim 1 of the '292 application.  Id.

122.   Claim 1 of the '292 application claims only technology invented by ATS in 2000 and 2001.

123.   Claim 1 of the '292 application claims only the combination proposed by Ken Cowans in 2002.

124.   Claim 1 of the '292 application claims subject matter that is ATS's Pre-Existing IP under the JDA.

125.   Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '292 application.

126.   *'333 Application.*  ATS made an inventive contribution to the plasma reactor of Claim 3 of the '333 application.  Id., ¶ 84.

127.   ATS made a creative contribution to the plasma reactor of Claim 3 of the '333 application.  Id.

128.    Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '333 application.

129.    *'782 Application.*  ATS made an inventive contribution to the method of Claim 1 and the reactor of Claim 10 of the '782 application.  Id., ¶ 80.

130.    ATS made a creative contribution to the method of Claim 1 and the reactor of Claim 10 of the '782 application.  Id.

131.    Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '782 application.

132.    *'859 Application.*  ATS made an inventive contribution to the method of Claim 15 of the '859 application.  Id., ¶ 88.

133.    ATS made a creative contribution to the method of Claim 15 of the '859 application.  Id.

134.    Thus, the application is Jointly Developed IP, and ATS owns a one-half undivided interest in the '859 application.

135.    ATS also made an inventive and/or creative contribution to each of the claims that depend from the claims referenced above.

136.    Dr. France's opinion that the limitations of the AMI patent applications that relate to using the electrostatic chuck as an evaporator in a refrigeration loop

were well-known or in the prior art does not change the result here.  Even if Dr. France were correct, an opinion which the Court has rejected, that would not defeat ATS's joint ownership claim because AMI first learned of that concept from ATS. Lucent Tecnhologies, Inc. v. Gateway, Inc., 543 F.3d 710, 718-19 (Fed. Cir. 2008) (affirming judgment as a matter of law that claimed subject matter that included alleged prior art disclosed under a joint development agreement was sufficient to establish joint ownership rights); Desny v. Wilder, 46 Cal. 2d 715, 733 (1956) ("Even though the idea disclosed may be 'widely known and generally understood,' it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty.") (internal citation omitted; internal quotation marks partially deleted).

137.   Each of the claims of the AMI patent applications identified above claim subject matter that is ATS's Pre-Existing IP under the JDA.

138.   Each of the claims of the AMI patent applications identified above claim subject matter that is Jointly Developed IP under the JDA.

139.   ATS does not dispute that each of the AMI patent applications also claims subject matter to which AMI made an inventive or creative contribution.

140.   Pursuant to the JDA, ATS is a joint owner of each of the AMI patent applications with a one-half (1/2) undivided interest in each of the AMI patent applications.  Ex. 1, p. 6, § 4.5.

141.   Deleting or substantially amending claims directed toward subject matter to which ATS made an inventive and/or creative contribution does not moot the controversy between the parties.

142.   At least Claim 1 of the '292 application, Claim 1 of the '183 application, Claims 1 and 8 of the '559 application, Claims 1 and 10 of the '782 application and Claim 3 of the '333 application, as filed, were directed, at a minimum, to Jointly Developed IP.  All corresponding dependent claims were also directed to, at a minimum, Jointly Developed IP.

143.   AMI subsequently cancelled and/or substantially amended many of these claims.

144.   Specifically, AMI has cancelled Claims 1-20 of the '292 application. Ex. 815, pp. 115-22.

145.   Accordingly, AMI has abandoned Claims 1-20 of the '292 application as they were originally filed and published.

146.   AMI amended Claim 1 of the '183 application to remove the claim limitations directed towards ATS's TDSF technology.  Ex. 602, pp. 645-52.  AMI's amendments to Claim 1 of the '183 application have also amended Claims 2-7, which depend from Claim 1.  Ex. 602, pp. 645-52.

147.   Accordingly, AMI has abandoned Claims 1-7 of the '183 application as they were originally filed and published.

148.    AMI amended Claims 1, 2, 8, 9, and 15 of the '559 application to remove the claim limitations directed towards ATS's TDSF technology.  Ex. 600, pp. 356-65.  AMI's amendments to Claims 1, 2, 8, 9, and 15 of the '559 application have also amended Claims 3-7, 10-14, and 16-18, which depend from Claims 1, 2, 8, 9, or 15.  Id.

149.    Accordingly, AMI has abandoned Claims 1-18 of the '559 application as they were originally filed and published.

150.    AMI amended Claims 1 and 10 of the '782 application to remove the claim limitations directed towards ATS's  TDSF concept.  Ex. 605, pp. 231-39. AMI has also cancelled Claims 2-9 and 11-18 of the '782 application.  Id.

151.    Accordingly, AMI has abandoned Claims 1-18 of the '782 application as they were originally filed and published.

152.    AMI cancelled Claims 3 and 7-12 of the '333 application.  Ex. 598, pp. 464-72.  AMI also amended Claim 4 of the '333 application, and thus Claims 5 and 6, which depend from Claim 4, no longer depend from cancelled Claim 3.  Id.

153.    Accordingly, AMI has abandoned Claims 3-12 of the '333 application as they were originally filed and published.

154.    AMI's actions after the lawsuit was filed indicate that AMI intended to abandon the claims directed to ATS's TDSF technology.

113

155.   Pursuant to Section 2 of Schedule 3, ATS is entitled to solely own and control further prosecution of this claimed subject matter.

156.   AMI shall take all steps necessary to reinstate the claims that AMI has abandoned in the five jointly owned applications: the '292 application, the '183 application, the '559 application, the '782 application, and the '333 application, and transfer control of the prosecution and maintenance of an application containing the abandoned claims to ATS.  See Richardson v. Suzuki Motor Co., Ltd., 868 F.2d 1226, 1249-50 (Fed. Cir. 1989); Synopsys, Inc. v. Magma Design Automation, Inc., 2007 WL 322353, at *34 (N.D. Cal. Jan. 31, 2007).

IV.   AMI Breached The Parties' JDA.

157.   *The Breach.*  At least one claim in each of the AMI patent applications, as filed, claimed subject matter that constitutes ATS's Pre-Existing or ATS's Developed IP.

158.   At least one claim in each of the AMI patent applications, as filed, claimed subject matter that constitutes Jointly Developed IP under the JDA.

159.   AMI failed to consult with ATS regarding the filing and prosecution of the AMI patent applications as required by Schedule 3 to the JDA.

160.   AMI breached Section 4.1 and/or Section 4.4 of the JDA by filing the AMI patent applications, which as filed claimed ATS's Pre-Existing IP or ATS's Developed IP.  Ex. 1, pp.  5, 6, §§ 4.1, 4.4.

161.   AMI breached Section 4.2 and Section 2 of Schedule 3 of the Agreement by filing the AMI patent applications, which as filed claimed Jointly Developed IP, without consulting with ATS regarding their filing and prosecution. Ex. 1, pp. 5, 17, § 4.2, Sched. 3, § 2.

162.   AMI's filing and prosecution of the '559 application, the '558 application, the '567 application, the '183 application, the '184 application, the '326 application, the '292 application, the '333 application, the '782 application, and the '859 application without consulting with ATS constitute a material breach of Sections 4.1, 4.2, 4.4, and/or Schedule 3, Section 2.

163.   *Damages.*  ATS is entitled to recover, as damages for AMI's breach, ATS's research and development expenditures and the value of the services ATS performed in reliance on the JDA.  See 1 Witkin, Summary of California Law, Contracts § 883, at 970 (10th ed. 2005); see also Copeland v. Baskin Robbins U.S.A., 96 Cal. App. 4th 1251, 1262-63 (2002) ("damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. This measure encompasses the plaintiff's out-of-pocket costs in conducting the negotiations and may or may not include lost opportunity costs."); Blair v. Brownstone Oil & Refining Co., 35 Cal. App. 394, 396 (1917) ("But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is, the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services."); Grosse v. Petersen, 30 Cal. App. 482, 486 (1916); Restatement (Second) of Contracts § 349 & cmt. a (1981).

115

164.   The rule applicable here is articulated in Section 349 of the Restatement of Contracts:

> As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.

Restatement (Second) of Contracts § 349.  The uncertainty of lost profits makes the rule applicable: "Under the rule stated in this Section, the injured party may, if he chooses, ignore the element of profit and recover as damages his expenditures in reliance. He may choose to do this if he cannot prove his profit with reasonable certainty."  Id., cmt. a.  The uncertainty of lost profit from AMI's breach of the contract renders the reliance rule appropriate here.

165.   ATS's recoverable damages caused by AMI's breach are in the amount of $905,300 ($1,094,297 after adding prejudgment interest) in support of the DX-01 project.  Exs. 236-288, 618, 772, 1500-1502; Stolinski, ¶¶ 3-15; Tregillis, ¶¶ 6-21.

166.   AMI bears the burden of proving any retained value by ATS that should be subtracted from this amount.  Restatement (Second) of Contracts § 349. Although the Section 349 speaks to a loss which the claimant would have sustained, the Court finds that proof of a benefit which the claimant would have enjoyed is analogous, and thus the burden is on AMI to demonstrate such sum.

116

167.    AMI's damages expert, Wagner, testified at trial that he had no opinion regarding the amount or percentage of benefit allegedly retained by ATS.  Wagner, Nov. 17, 2009 (am), p. 82:8-25.  AMI did not introduce any other evidence of the amount of ATS's allegedly retained benefit.

168.    AMI has not established by a preponderance of the evidence the amount of any retained value by ATS.

169.  ATS's reasonable reliance was not affected by Dr. Brillhart's statement to Goyins in April 2005; ATS's reliance was reasonable through the time it learned that AMI had in fact filed the ten patent applications, and at that point, terminated its activities.

170.  ATS accelerated the depreciation of its research and development expenses incurred regarding the joint development project/DX-01 with AMI in the middle of 2006.  Tregillis, Nov. 13, 2009, p. 170:19-24.

171.    ATS wrote off the $550,000 in research and development expenses related to the TDSF SOW in mid-2006 because, at that time, ATS believed such expenses were not recoverable because sales of the DX-01 were unlikely to occur. Id., p. 174:15-24.

172.  The tax treatment of ATS's reliance damages is irrelevant to the determination of damages.  See Henninger v. Southern Pac. Co., 250 Cal. App. 2d 872, 878-80 (1967); Restatement (Second), Torts § 914A.

173.  However, a write-off based on ATS's belief that it would not recover its costs is evidence of the type of loss that the claimant would have sustained if the contract–specifically, the TDSF SOW–were performed.  Restatement (Second) of Contracts § 349. The evidence establishes that loss with reasonable certainty and by a preponderance of the evidence.  Thus, ATS's damages for its breach of contract claim should be reduced by $550,000.

174.  ATS's recoverable damages are $429,475 ($355,300, plus prejudgment interest).

175.  *Double Recovery.*  AMI asserts that in the event the Court grants ATS's request for declaratory relief canceling the AMI patent applications, any award of monetary damages would result in an improper double recovery.  AMI PFCCL, ¶¶ 931-942.   The theory is factually flawed because there is no connection between ATS's reliance damages and its rights with regard to the AMI patent applications.

176.  *Role of B/E Aerospace.*  AMI asserts that ATS is not entitled to damages because some or all of its reliance expenditures were incurred or advanced by its parent, B/E Aerospace.  AMI PFCCL, ¶¶ 943-960.  The argument overlooks the fact that AMI contracted with ATS, and that ATS either incurred or caused to be incurred its reliance expenditure.  The happenstance of how expenditures were advanced and accounted for within ATS and its corporate parent does not diminish

AMI's liability for the reliance damages which the Court has found.[13]  <u>See</u> Findings of Fact, ¶¶ 321-322, <u>supra</u>.

177.  *Mitigation.*  AMI had the burden of proof to prove ATS ability to mitigate and quantum of any such mitigation.  <u>Brandon & Tibbs v. George Kevorkian Accountancy Corp.</u>, 226 Cal. App. 3d 442, 460-61 (1990).  AMI failed to carry its burden.  As indicated above, the Court found ATS's continued performance until it terminated in 2007 reasonable.

178.  *Damages Limitations.*  The damages limitation provisions of Section 9.3 of the JDA are enforceable.  Section 9.3 is clear and unambiguous on its face and expressly limits the damages available to the parties if a breach of this contract occurs.  California law recognizes the ability of parties to agree to limit their liability for damages in the event of a breach.  <u>Markborough California., Inc. v. Superior Court</u>, 227 Cal. App. 3d 705, 714 (1991).

179.  The damages limitation in Section 9.3 of the JDA does not exclude reliance damages because they are not "**SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR CONTINGENT DAMAGES**."  Ex. 1, p. 11, § 9.3 (capitalization and bold in original).  Expenditures in reliance result directly from the breach.

---

[13]Had B/E asserted a claim, AMI would likely contend that it was a stranger to the transaction and had no standing.

119

180.   Reliance damages are an alternative to expectation damages, only one component of which is consequential: a party may seek, "[a]s an alternative to the measure of damages stated in § 347, . . . damages based on his reliance interest, including expenditures made in preparation for performance or in performance." Restatement (Second) of Contracts § 349.   Under the Restatement (Second) of Contracts, the general measure of damages for breach of contract is the party's "expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." Id. § 347.  Thus, "consequential damages"–which are "losses that do not flow directly and immediately from an injurious act but that result indirectly from the act," Black's Law Dictionary 445-46 (9th ed. 2009)–are a subset or component of expectation damages. There is no aspect of consequential damage in reliance damages.

181.   Reliance damages are certain in that they are part and parcel of the invited performance under the JDA.  They cannot be characterized as consequential or special.  See AMI PFCCL, ¶ 1126, citing, Glendale Fed. Sav. & Loan Ass'n v. Marina View Heights Dev. Co., 66 Cal. App. 3d 101, 125 (1977).

V.   AMI's Counterclaims.

182.   *AMI's Counterclaim For Breach Of Contract.*  The Court previously determined that the '353 Patent and '465 application claim only ATS's Pre-Existing IP and/or ATS's Developed IP as defined by the JDA, and that ATS is the sole

120

owner of the '353 Patent and '465 application and the subject matter claimed therein.

183.    Neither the '353 Patent nor the '465 application claim any Jointly Developed IP as defined by the JDA.

184.    ATS had no obligation to consult with AMI regarding the '353 Patent or the '465 application.

185.    AMI made no inventive or creative contribution to ATS's creation, conception, or first reduction to practice of the technology in Claims 3 and 4 of the '835 Patent.

186.    The '835 Patent claims only ATS's Pre-Existing IP as defined by the JDA.

187.    The '835 Patent does not claim any Jointly Developed IP as defined by the JDA.

188.    ATS had no obligation to consult with AMI regarding the '835 Patent.

189.    ATS did not breach the JDA.

190.    ATS did not cause any harm to AMI.

191.   *AMI's Claim For A Declaration Of Joint Ownership Of The '835 Patent.*   The Court previously determined that the '353 Patent, Claims 1, 2, 5-8 of the '835 Patent, and the '465 application claim only ATS's Pre-Existing IP and/or ATS's Developed IP as defined by the JDA, and that ATS is the sole owner of the '353 Patent and the '465 application and the subject matter claimed therein.

192.   AMI failed to prove that it made an inventive or creative contribution to the creation, conception, or first reduction to practice of Claims 3 or 4 of the '835 Patent.

193.   AMI does not have any ownership interest in the '835 Patent.

194.   *AMI's Claim For A Declaration Of Joint Ownership Of The Physical DX-01 And PX-7 Products.*   AMI presented various evidence regarding alleged contributions that it made after May 14, 2005.

195.   No contribution that AMI allegedly made after the JDA expired on May 14, 2005 has any relevance to ownership under the JDA.

196.   ATS and AMI are joint owners of the physical DX-01 chiller units.

197.   AMI failed to carry its burden to prove that any AMI employees made any inventive or creative contributions to the creation, conception, or first reduction to practice of any improvement, enhancement, or modification to any of the PX-7 units during the course and as a result of the TDSF SOW.

198.   AMI failed to carry its burden to prove that any improvement, enhancement, or modification to any of the PX-7 units is Jointly Developed IP.

199.   AMI is not entitled to a declaration that it has any ownership interest in any of the PX-7 units.

VI.   <u>AMI's Affirmative Defenses</u>.

200.   *AMI's Unclean Hands Defense.*  AMI failed to prove that ATS acted improperly or committed any misconduct.

201.   AMI failed to prove that any ATS improper activity or misconduct related directly to ATS's claim for breach.

202.  Even assuming that ATS failed to reveal its own patent filing, such a non-disclosure is not sufficiently linked to AMI's breach of its duty to consult that its conduct would amount to unclean hands.  <u>Fibreboard Paper Products. Corp. v. East Bay Union of Machinists, Local 1304</u>, 227 Cal. App. 2d 675, 728 (1964) ("It is equally well settled in this state, however, that it is not every wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.").

203.    Accordingly, AMI failed to establish the elements of its unclean hands affirmative defense.  See Unilogic, Inc. v. Burroughs Corp., 10 Cal. App. 4th 612, 620-21 (1992); Fibreboard Paper Products. Corp., 227 Cal. App. 2d at 728-29.

204.    *AMI's Estoppel Defense*.  AMI failed to prove that ATS misrepresented or concealed any material facts from AMI.

205.    AMI failed to prove that ATS knew any true facts that it misrepresented or concealed from AMI.

206.    AMI failed to prove that AMI did not know any true facts that ATS had misrepresented or concealed from AMI.

207.    AMI failed to prove that AMI was injured as a result of relying on ATS's conduct.

208.    Accordingly, AMI failed to establish the elements of its estoppel affirmative defense.  Wells Fargo Bank, N.A. v. Bank of America NT & SA, 32 Cal. App. 4th 424, 437-38 (1995) ("A party asserting the defense of estoppel must establish the following elements: (1) the party estopped must know the facts; (2) the party estopped must engage in conduct intended to be acted upon by the party asserting estoppel; (3) the party asserting estoppel must be ignorant of the true state of facts; and (4) injury must result from reliance on the other's conduct.").

209.    *AMI's Waiver Defense.*  AMI failed to establish that ATS had knowledge of AMI's breach.

210.   AMI failed to establish that ATS continued to accept performance from AMI despite knowledge of AMI's breach.

211.   AMI failed to establish that ATS freely and knowingly gave up its right to have AMI do something more than inform ATS regarding its patent filings on any Jointly Developed IP.

212.   ATS failed to adduce any evidence of a written waiver of rights, as required by the JDA.  Ex. 1, p. 13, § 10.9.   The general rule that a contractual provision pertaining to written notice may be waived, either expressly or by conduct by the party for whose benefit it was inserted (AMI PFFCL, ¶ 1060, citing Gillmore v. Hoffman, 123 Cal. App. 2d 313, 320 (1954)), has no force in light of JDA's strict waiver provision.  For similar reasons, the principle that waiver may occur by conduct, including silence, warranting an inference of relinquishment of that right (AMI PFFCL ¶ 1060, citing Skulnick v. Roberts Express, Inc., 2 Cal. App. 4th 884, 891 (1992)), is inapplicable, assuming that the factual predicates for such a theory were present.

213.   Accordingly, AMI failed to establish that ATS waived its right to recover for AMI's breach.  CACI 336; see also Kern Sunset Oil Co. v. Good Roads Oil Co., 214 Cal. 435, 440-41 (1931).

214.   *AMI's Mitigation Defense.*  AMI failed to prove by a preponderance of the evidence that ATS could have avoided any of its damages with reasonable efforts or expenditures.

215.    To the contrary, Wagner agreed that it was reasonable for ATS to continue developing the DX-01 with AMI up through 2007 because ATS was encouraged by AMI to do so.  Wagner, Nov. 17, 2009, p. 96:5-15 ("I think it was reasonable that both sides continued to development [sic] of the DX-01.").

Any Finding of Fact more appropriately deemed a Conclusion of Law shall be treated as such.  Any Conclusion of Law more appropriately deemed a Finding of Fact shall be treated as such.

* * * * * * * * * * * * * *

ATS is directed to tender a form of Judgment consistent with these findings of facts and conclusions of law within fourteen days.

DATED: May 18, 2010

_____
JAMES V. SELNA
UNITED STATES DISTRICT JUDGE